THE PEOPLE, ex rel. WILLIAM H. WOODS, Appellant, *v.* ISAAC
W. CRISSEY, as Comptroller, etc., Respondent.

The legislature may provide for the manner in which the result of an elec-
tion shall be determined and declared, and where the mode is so provided,
until it is obeyed, the election is not complete and the candidate not
qualified to serve.

At the general election, held in November, 1881, M. & F. were candidates
for the office of alderman in the city of Troy. Two of the inspectors of
election made out and signed a statement certifying that F. had received
a majority of the votes cast. The other two inspectors refused to sign
the same. The incomplete statement was filed in the office of the
city clerk, and F. took the oath of office. *Held,* that until the rights of
the parties were tested in the courts and the result settled, the election
was to be treated as a failure so far as either party sought to found a
right upon it, and neither could claim any benefit therefrom ; that the pro-
vision of the original charter of the city of Troy (§ 5, chap. 131, Laws of
1816), providing for the manner of electing aldermen, requiring inspectors
of election by a written statement to certify and declare the result, and
file their certificate in the office of the city clerk, has not been repealed
or modified unless the general election law was applicable, and that
makes the duties of inspector, in ascertaining and declaring the vote,
even more specific; and that by such failure to elect, a vacancy was
created. (§ 6, chap.°101, Laws of 1855.)

At the time of said election, M. was an incumbent of the office, having been
elected for a term from March, 1881, to the general election of that year,
under the amendment of the city charter of 1880 (§ 7, chap. 30, Laws of
1880), which changed the date of the municipal election from March to
the day of the general election in November, and which provided for
filling the short terms at the general election in 1880. *Held,* that as no
successor to M. was "duly qualified," he held over under the provision
of the city charter of 1870 (§ 6, title 6, chap. 598, Laws of 1870), declaring
that "all persons elected or appointed under this act shall continue to
hold their office until a successor is duly qualified" ; that said provision
applied to the office of alderman ; that it was not inconsistent with the
provisions of the amendatory act of 1880 in reference to the short term;
and so it was not repealed by said act.

F., who prior to the general election in November, 1881, had not sought to
act as alderman, on the night before that election, resigned and at that
election fifty-five votes were cast for him for alderman " to fill vacancy."
No public notice of his resignation, or of any vacancy in the office, or of
an election to fill such vacancy had been given, nor had the common coun-
cil directed an election to fill a vacancy. At a special meeting of the com-
mon council held a week after the election under call of the mayor, " for

the purpose of canvassing the votes for mayor and school commissioners," D. F., city clerk, read the resignation of F. and announced the votes cast for him to fill vacancy. The president declared F. to be elected, and entitled to qualify and take his seat ; the oath of office was administered and filed, and F., against the remonstrances of some of the board, acted as alderman. *Held*, that the sole effect of the resignation was upon F. as a contestant, and was an abandonment of his claim ; that the only mode of filling the vacancy was by order of the common council, directing an election and determining the time and place (§ 8, chap. 131, Laws of 1816 ; § 2, chap. 293, Laws of 1854 ; § 4, chap. 101, Laws of 1855) ; and that, therefore, F. was not elected.

*People, ex rel. Davies,* v. *Cowles* (13 N. Y. 350), distinguished.

Immediately after the adjournment of said meeting of the common council, the new mayor, by order in writing, suspended D. F. from office, and then nominated and appointed O'B. city clerk *pro tem. ;* by him the roll of new members was called ; six old and seven newly-elected members answered to their names. The seven took the oath of office before O'B., who was a notary public, and filed their oaths in the office of the city clerk, and thereupon the thirteen, with M., fourteen constituting a quorum, proceeded to act as a board. K. was nominated and confirmed as city clerk. *Held*, that the meeting was lawful and lawfully constituted; that the action of the seven new aldermen, even if they did not legally take the oath of office, was valid ; also that while the suspension of D. F. did not amount to a removal, the nomination or confirmation of K. had that effect ; that the city clerk, having no fixed term of service, could be removed at pleasure by the proper appointment of a successor.

The common council so constituted proceeded to elect two police commissioners ; it was resolved that they be elected at one time and by one ballot, each voting for but one. Eight voted for M.; six for C. By the rules of the common council, the assembly rules as laid down in Croswell's Manual are made controlling. *Held*, that conceding the provision of the charter of 1880, confining the vote of each alderman in the election of police commissioners to one of the two to be chosen for the same term, to be unconstitutional, it imposed no restraint and the aldermen must be deemed to have voluntarily voted as they did, and the failure to exercise their full rights did not affect the vote actually given ; that as under the assembly rules, a quorum being had, a majority of all present voting for the specific office, was sufficient to elect, there being a quorum present, and the officer chosen in each case having received not only a majority of those voting to fill that office, but all of those so voting was legally elected.

The provision of said act of 1880 (§ 10), requiring that "the compensation or salary of any officer shall be fixed before his appointment," does not require the salary to be fixed before every new appointment ; when once properly attached to the office it is sufficient.

The power given by said act (§ 3) to the mayor, to suspend any ap-

pointed officer for misconduct or neglect, was simply incident to and depended upon the power of removal given to the common council, and was repealed, as to police commissioners, by the provision of the amendatory act of 1881 (§ 1, chap. 76, Laws of 1881), which gives to the Supreme Court exclusive jurisdiction and power to remove them.

The said act of 1881 is not repugnant to the constitutional provision requiring (Art. 3, § 16) a local bill to embrace but one subject, and that to be expressed in the title.

Where, therefore, a warrant for supplies was drawn by M. & C., and by H., a duly appointed commissioner, but who had been suspended by the mayor after the going into effect of the act of 1881, as three of the four police commissioners of said city, and was presented to defendant, as comptroller, to be countersigned, which was necessary before payment could be demanded, *held*, that the signers of the warrant were lawfully police commissioners; and that a peremptory *mandamus* was proper, requiring the comptroller to countersign said warrant.

(Argued February 9, 1883; decided March 16, 1883.)

APPEAL from order of the General Term of the Supreme Court, in the third judicial department, made December 16, 1882, which affirmed an order of Special Term denying an application on the part of the relator for a peremptory *mandamus* to compel defendant as comptroller of the city of Troy to countersign a warrant drawn by John Magill, S. A. Craig and Elisha W. Hydorn, as police commissioners of said city, in favor of relator, for supplies purchased by and furnished to the board of police commissioners.

The facts so far as material are stated in the opinion.

*Benjamin H. Hall and Samuel Hand* for appellants. The certificates were entire nullities as signed but by half of the inspectors in each district, and dissented from by the other half. (McCrary on Elections, § 274; *Perry* v. *Whitaker*, 71 N. C. 475.) The election is not complete until the result has been declared and certified by the proper inspectors. (*People, ex rel. Conliss,* v. *North,* 72 N. Y. 124, 128, 129; McCrary on Elections, §§ 215, 274; *Barnes* v. *Adams*, 2 Bartlett, 771; Laws of 1855, chap. 513, § 3.) In the absence of any return or canvass showing the result of the election, and until by that

or some judgment of the court some one is put in a position to qualify and has done so, the former incumbent must hold over even where there is no doubt about the actual result. (*People* v. *North,* 72 N. Y. 124, 128, 129 ; 1 R. S. 117, § 9.) Repeal of a statute by implication will never be presumed. (*Bowen* v. *Lease,* 5 Hill, 221 ; *Wallace* v. *Bassett,* 41 Barb. 92 ; *Williams* v. *Potter,* 2 id. 311 ; Sedgwick on Statutory Const. 127, 128.) An election to fill a vacancy must be ordered by the common council. (*Secord* v. *Fautch,* 44 Mich. 89 ; *Foster* v. *Scarff,* 15 Ohio, 532 ; *Real* v. *Ray,* 17 Ind. 554 ; *People* v. *Potter,* 6 Cal. 26 ; McCrary on Elections, §§ 135, 136, 137 ; Laws of 1854, chap. 293, § 2 ; Laws of 1855, chap. 101, § 4 ; *People* v. *Peck,* 11 Wend. 64 ; *Rex* v. *Gaborian,* 11 East, 77.) The original order of suspension in May, 1881, was absolutely void for want of jurisdiction. (Laws of 1870, chap. 520 ; id., chap. 598, title 2, § 2 ; Laws of 1880, chap. 30 ; id., chap. 328, p. 476 ; Laws of 1881, chap. 76, § 6.) The term of office of the four commissioners (if any) appointed under chapter 30, Laws of 1880, was not declared by law, and was consequently during the pleasure of the common council. (Constitution, art. 10, § 3.) As the two acts cannot exist together, hence, upon well-established principle, the latter repeals the former beyond all doubt or question so far as the trial by the common council is concerned. (*People* v. *Brooklyn,* 69 N. Y. 605 ; *Dean of Ely* v. *Bliss,* 5 Beav. 582 ; *Norris* v. *Crocker,* 13 How. [U. S.] 429 ; *Mongeon* v. *People,* 55 N. Y. 613, 616 ; *People* v. *Van Nort,* 64 Barb. 205 ; *Heckmann* v. *Pinney,* 81 N. Y. 215 ; *Pratt* v. *Munson,* 84 id. 588.) The suspension attempted by the mayor cannot exist consistently with removal by the Supreme Court. (1 Laws of 1880, p. 119 ; *People* v. *Brooklyn,* 69 N. Y. 605 ; *Heckmann* v. *Pinney,* 81 id. 215 ; *Pratt* v. *Munson,* 84 id. 588 ; *Dexter P. R. Co.* v. *Allen,* 16 Barb. 15 ; *People* v. *Van Nort,* 64 id. 205.) There is nothing in the objection that chapter 76 of Laws of 1881 is unconstitutional on account of defect in its title. (*People* v. *Briggs,* 50 N. Y. 533 ; *In re Mayer,* id. 504 ; *In re Met. Gas L. Co.,* 85 id. 526, 529 ; *Kerrigan* v.

*Force*, 68 id. 384; *People* v. *Banks*, 67 id. 568, 571.) The only way to question the acts of the police commissioners, on the ground of unconstitutionality of the Troy police law, is by a *quo warranto* by the attorney-general. It cannot be done by the defendant or other person collaterally. (*Mott* v. *Connolly*, 50 Barb. 516; *Demarest* v. *Wickham*, 63 N. Y. 323; *People, ex rel. Dolan,* v. *Lane*, 55 id. 217; *People* v. *White*, 4 Wend. 400; *People* v. *Stevens*, 5 Hill, 616; *People, ex rel. Watkins*, v. *Perley*, 80 N. Y. 624.) The court will never declare a law unconstitutional, unless unavoidably forced thereto by some provision of the Constitution clearly and unmistakably prohibiting or restricting the thing sought to be done. (*People* v. *Comstock*, 78 N. Y. 365; *In re Gilbert R. Co.*, 70 id. 371; *People* v. *Albertson*, 55 id. 54; *People* v. *Pinckney*, 32 id. 377. The authorities of a city are the aldermen thereof. (*Purdy* v. *People*, 4 Hill, 384, 387, 409.) There is nothing in the objection that the new police commissioners, Craig and Magill, were not such, because their oaths were not filed with the proper clerk. (*Weeks* v. *Ellis*, 2 Barb. 324; *Greenleaf* v. *Low*, 4 Denio, 160; *People* v. *Cook*, 4 Seld. 64, 84; *People* v. *McMannus*, 34 Barb. 620; *Foot* v. *Stiles*, 57 N. Y. 401; *Cronin* v. *Bundy*, 16 Hun, 520; Laws of 1880, chap. 30, § 3, p. 119; *People* v. *Fitzsimmons*, 68 N. Y. 514.) However defective the oath, or indeed if there was a failure to take the oath at all, nevertheless the new aldermen are vested with the office, and by the language of the statute (1 R. S. 121, § 31), the failure to take and subscribe the oath of office is only a ground of forfeiture and punishment. In such a case the officer holds until proceedings are taken by *quo warranto* to forfeit his office. (*In re Kendall*, 85 N. Y. 302; *Foot* v. *Stiles*, 57 id. 401; *Weeks* v. *Ellis*, 2 Barb. 324; *People* v. *Hopson*, 1 Den. 574; *Hamlin* v. *Dingman*, 5 Lans. 61; *Mayor* v. *Tucker*, 1 Daly, 107.) City clerks may take the oaths of officers embraced in section 22, chapter 5 of 1 R. S. 119. (*People* v. *Stowell*, 9 Abb. N. C. 456.) The method of appointing the police commissioners provided by the act of 1881 (Chap. 362), is in conformity to the Constitution,

1883.]        PEOPLE, ex rel. WOODS, *v.* CRISSEY.        621

Statement of case.

and the new aldermen are to be held as aldermen *de jure* as well as *de facto*, by all the world until a forfeiture is enforced by the intervention of the State. (57 N. Y. 403; 85 id. 305; Laws of 1872, chap. 2, § 25, p. 10; id., chap. 143, § 3, p. 370; Laws of 1876, chap. 30, § 3, p. 21; Laws of 1870, chap. 77, § 4, p. 77; Laws of 1867, chap. 197, § 1, p. 299; Laws of 1870, chap. 519, § 3, p. 1167; Laws of 1874, chap. 315, § 22, p. 372; Laws of 1869, chap. 194, § 2, p. 350; Laws of 1876, chap. 367, § 14, p. 346; Laws of 1877, chap. 127, § 1, p. 129; id., chap. 79, § 2, p. 83; Laws of 1866, chap. 444, § 4, p. 987; Laws of 1869, chap. 17, § 2, p. 30; Laws of 1870, chap. 519, § 3, p. 1167; Laws of 1872, chap. 2, § 3, p. 6; id., chap. 186, § 3, p. 519; Laws of 1873, chap. 335, § 4, p. 484; Laws of 1874, chap. 515, § 1, p. 704; id., chap. 542, § 1, p. 729; Laws of 1877, chap. 79, § 2, p. 83; Laws of 1879, chap. 46, § 1, p. 43; Laws of 1870, chap. 255, § 2, p. 571.)

*R. A. Parmenter and Esek Cowen* for respondent. The provision in section 4 of chapter 328 of the Laws of 1880, limiting and prescribing the manner of voting by the common council when electing police commissioners, is unconstitutional. (*Wentzler* v. *People*, 58 N. Y. 529; *People* v. *Pinckney*, 32 id. 382; *People* v. *Albertson*, 55 id. 387; *People* v. *Raymond*, 27 id. 428; *Menges* v. *City of Albany*, 56 id. 374; 69 id. 86.) The people could without any notice elect an alderman to fill the vacancy, and they did so, for by the returns signed by all the inspectors of election, Fleming received fifty-five votes to fill the vacancy occasioned by his own resignation. (*People, ex rel. Davis,* v. *Cowles*, 13 N. Y. 350; R. S., § 22, art. 3 of chap. 5 of part 1.) O'Brien, the newly-appointed clerk, could not administer an oath of office as notary public. (R. S., chap. 5, part 1; id., title 6 of chap. 5, § 2 of art. 1; Laws of 1880, chap. 332, § 3.) Hydorn's suspension could not be inquired into collaterally. (Dillon on Municipal Corporations, § 201.) Chapter 76, Laws of 1881, is void, because in contravention of section 16 of article 3 of the Constitution, which provides that a local bill shall contain but

one subject, and that subject shall be expressed in its title. (*People* v. *Hills*, 35 N. Y. 449; *People* v. *Commrs. of Highways*, 53 Barb. 70; *People* v. *Allen*, 42 N. Y. 404.) It is not sufficient that a bill express a subject in its title, it must truthfully express the real subject. (*People* v. *Allen*, 42 N. Y. 404; *Gaskin* v. *Meek*, id. 186.)

FINCH, J. Out of the special legislation relating to the city of Troy have arisen very serious complications, which we are asked to remove by determining the legal questions involved. These respect the official right and authority of some of the persons who are acting as police commissioners of the city, and a challenge of their title to that office. Two of them, Magill and Craig, claim to have been appointed by the common council, under the provisions of chapter 328 of the Laws of 1880, which act the respondent asserts to be unconstitutional, and so raises the first question which has been argued before us. We ought not to decide it. It has a possible importance beyond the issues here involved. It touches the question of minority representation upon which has been founded very much of legislation, and about which there is room for difference and debate. It respects also the power of the legislature to put restraint upon the action of city authorities, and to guide and limit their modes of procedure. We do not at all mean to intimate or suggest a doubt; but to follow a rule long and wisely adopted by the courts, not to decide a constitutional question unless directly involved in the determination of the case presented, nor without clear and apparent necessity for so doing. In the present case its determination is not essential to the decision, nor even to the general purposes for which this litigation was instituted. Passing by the obvious suggestion that the assailed commissioners were officers *de facto*, and waiving its consideration, out of deference to the imperiled peace of a disturbed city, and the pressing need of settling the questions of official right, there is a further reason why the constitutional inquiry is not here. The ground alleged as working a violation of the fundamental law is, that

1883.] PEOPLE, ex rel. WOODS, v. CRISSEY. 623

Opinion of the Court, per FINCH, J.

the legislature not only designated the common council as the authority to appoint police commissioners, which was so far a lawful enactment, but proceeded to dictate to such common council the mode of making the appointment; and thus, by confining the vote of each alderman to one out of the two to be chosen for the same term, made it possible for less than a majority of the quorum to elect one of the commissioners. But, if we assume this provision to be unconstitutional, it was a nullity. We are not at liberty to say that the common council did not know it. They are presumed to have known the law, and had an official legal adviser entirely competent for their instruction. They must be held then to have voted without restraint. We cannot say that an unconstitutional law, if indeed it be such, put them under compulsion. A nullity, known to be such, cannot compel. The aldermen chose to vote, therefore, as they did vote; and the question comes down to this, as the learned counsel for the respondent very frankly concede, viz: whether, if the act of 1880 had not been in existence, and the aldermen had done exactly what they did do, the result would have been a legal election of Magill and Craig. Let us see. Two officers were to be chosen and two offices to be filled, and this the board determined to do at the same time and upon one ballot. Eight members voted on the question of electing an incumbent for one of the offices, and six on the question of filling the other. In each case the officer chosen had not only a majority of those voting to fill that office, but all of those so voting. Magill received eight votes which was a majority of the quorum, and would have been elected even if the other six had voted against him. We may thus confine our attention to Craig. He received six votes. These, however, were all the votes cast for his separate office. A quorum being had, a majority of all present and voting for the specific office was sufficient to elect. Such is the rule in the assembly, upon an election of speaker, as laid down in Croswell's Manual; and that authority is made controlling on the common council by its own rules. (Rule 49.) While only six voted upon the question of filling Craig's office, the board might have required

the whole fourteen to have so voted. (Rule 24.) Not having done so, the eight who did not vote must be deemed to have been excused. The board then put their own construction upon the effect of their own voting. They declared Magill and Craig elected, and nobody dissented. Not only that, but they had done precisely the same thing before. In a full board, in November, 1880, Magill and Hydorn were each chosen by nine votes, being less than a majority of the quorum present. Both were declared elected, their title to their offices recognized, and Hydorn suspended by Mayor Murphy, and sought to be removed. Each alderman who was content to vote for one commissioner might have voted for two, and that would have raised the constitutional question. But they chose not to do so, and Magill and Craig were elected. (*The People, ex rel. Watkins,* v. *Perley,* 80 N. Y. 624.) The fault of the argument to the contrary is that it treats the sum of the votes cast for the two separate offices as identical with the number of those voting for each. That will not do. Fourteen did not vote to fill the office for which Craig was a candidate, but only six, and the rest were excused. For these reasons we think the constitutional question is not here for decision, and so far as that objection is concerned, the right of Magill and Craig to act as commissioners cannot be successfully assailed.

The next attack upon their title comes from a different direction. It is claimed that the common council never appointed them at all, and the facts from which this contention springs are somewhat singular and quite unusual. At the date of the appointment the common council of Troy was in fragments; and each of the pieces claimed to be itself the true board and the genuine authority, and denied regularity to its adversary. A full board consisted of twenty-six members, and it required fourteen to constitute a quorum. Such a quorum was present on the 14th day of November, 1882, when Craig was chosen police commissioner, if Morrissey, who constituted one of the quorum, and acted and was recognized by his associates, was legally an alderman and a lawful member of the board. It is asserted that he was not, and on the following state of facts.

Morrissey was elected in March of 1879 for a regular term of two years, expiring in March of 1881. During such term, by an amendment of the city charter, the date of the usual municipal election was changed from March to November, and to the general election held in the latter month. (Laws of 1880, chap. 30.) From the close of Morrissey's term in March of 1881, to the general election in November of that year, the change thus made involved a fragment of a term for which special provision was necessary ; and which was supplied by the further enactment that such short and intervening term should be filled at the general election in 1880. At that time Morrissey was again elected for the short term, and became his own successor at the close of his full term, for a further period ending with the Tuesday succeeding the second Monday in November, 1881. Just before that date, and while still an alderman, he was again a candidate for the same office, with one Fleming for his competitor. What was the real result of the struggle between the two we do not and cannot know. At the close of the election, and the completion of the count, two out of the four inspectors refused to certify that Fleming had received a majority of the votes cast, upon the ground that ballots for him had been fraudulently placed in the box by unauthorized persons, and that the statement of his vote prepared by the other inspectors was not true. It is said on one side, but denied on the other, that the apparent result was announced at the close of the canvass. On that subject the language of the affidavit which furnishes for us the facts is somewhat ambiguous. The language is that "after the result had been made known by the canvassers". the statement was prepared which two of the inspectors refused to sign. How it was "made known," or to whom, we are not told. Certainly it falls short of establishing a public proclamation of the vote by the chairman of the board, and it is quite certain that the dissenting inspectors could not have concurred in what they declared to be a falsehood. The incomplete statements, signed by half only of the inspectors, were filed in the office of the city clerk ; Fleming took and filed the oath of office on the

15th of November, 1881, and at once instituted proceedings to compel the dissenting inspectors to sign the certificate of his election. That legal proceeding appears to have been abandoned, and the certificate was never signed by the inspectors who refused. At the annual meeting of the common council immediately following the election, and held on the 15th day of November, 1881, neither Morrissey nor Fleming appeared, and, during the whole of the year succeeding, the latter did not participate in any meeting of the common council; while in three meetings held in 1881, the regularity of which is questioned, Morrissey took part, but abstained from attendance in the following year down to the date of the general election.

. At this point it appears needful to determine who was lawfully the alderman of the seventh ward, entitled to occupy the seat for which Morrissey and Fleming contested, during the year succeeding the election of November, 1881. We cannot say that either was elected. It is argued that one must have been. That does not follow. A canvass in which all or a majority of the inspectors concurred, or an investigation by a court of justice in which the vote actually and honestly cast was correctly counted might have resulted in a tie. While that is not probable, it is certainly possible. We cannot know. We have no legal evidence before us from which we can give the seat to either by virtue of the election. Either one, by proper pursuit of his legal remedy, might have solved the problem, but neither did so, and as the case stands, upon the facts, we must deny to both alike any benefit from an election the result of which we cannot correctly and lawfully know. It is not possible for us to avoid this conclusion. The votes are not here for us to count; the authority appointed by law has not acted, has certified nothing, and stands equally divided, and asserting contrary results, both of which cannot be true; and neither party has chosen to test his right in the courts and settle the result. For us nothing is possible, except to treat the election as a failure so far as either party seeks to found a right upon it, and deny to either any resultant benefit from that source. That being so, it follows, that Morrissey, who was the alderman when this

undetermined action took place, continued to be such under the charter provisions which permit an officer whose term has expired to hold over, unless there is force in the argument of the respondent founded upon the language of such provision, and the peculiar character of the short or fragmentary term.

The charter provides (Laws of 1870, title 6, § 6), that "all persons elected or appointed under this act shall continue to hold their office until a successor is duly qualified, unless suspended or removed." No successor to Morrissey was duly qualified: (*People, ex rel. Conliss*, v. *North*, 72 N. Y. 124.) at least during the year of which we are now speaking. The case cited arose under the provisions of the charter of Cohoes, which are different from and more specific than those of the charter of Troy, but the same principle governs both cases. That is, that the legislature can provide for the manner in which the result of an election shall be determined and declared, and their enactment is binding; that the power to declare the result must be lodged somewhere, and that where the mode of so doing is commanded, until it is obeyed and such acts are done, the election is not complete and the candidate not qualified to serve. By the original charter of the city of Troy (Laws of 1816, chap. 131, § 5), the manner of electing aldermen is provided, and upon the canvass of votes, the inspectors are required, by a written statement, to certify and declare the result, and file their certificate in the office of the city clerk. That provision has not been repealed or modified, so far as we have been able to ascertain, unless the general election law applies to charter officers voted for at a general election, and that makes the duty of the inspectors even more specific. So that, in the present case, the duty of ascertaining and declaring the result was lodged with the inspectors, and the mode of their action prescribed by law. Following the doctrine of the case cited, we must hold that until the officers appointed by law to determine the question did so lawfully determine it, or the judgment of a competent court had decreed the result, Fleming was not qualified to serve, and so Morrissey, during the year in question, had no successor " duly qualified," and himself held over pursuant to the statute, unless some or all of three remaining objections are found to be valid.

It is said the charter of 1870, permitting old officers to hold over, applies only, by its express terms, to officers elected or appointed under that act, and that the aldermen were not such. The criticism seems to us quite technical, and without any substantial merit, and if sustained, would lead to very unexpected and injurious results. The charter provides (Title 2, § 1), that "the officers of said city shall be a mayor, two aldermen for each ward, * * * all of whom shall be elected by ballot, or appointed, and shall possess the powers and discharge the duties of their respective offices, as now provided by law, except as modified by the provisions of this act." And thus the existing statutory regulations, so far as unmodified, were incorporated into and became integral and essential parts of the new enactment, by its reference to and recognition of such older provisions. The aldermen chosen after 1870 were officers of the city under and by virtue of that act, and were elected by force of its authority. It does not at all alter the case that the mode of their election and the range of their duties was fixed by a reference to earlier provisions; nor that the date of their election, and a consequent temporary modification of their terms was effected by an amendment. The old unrepealed enactments, by the express reference of the charter, and the later provisions, by amendment of the charter, became part and parcel of that instrument, and constituted elements of its completed structure.

But it is said again that the clause of the charter, allowing officers to hold over, does not relate to aldermen. Section 6, which we have partly quoted, in its complete form provides : " The official term of *all persons elected or appointed* under this act, except as otherwise herein provided, shall commence as follows, viz. : Such as are required to give security, from the time such security shall be given and approved ; such as are not required to give security, on the first Monday after their appointment and confirmation ; and *all persons elected or appointed* under this act shall continue to hold their office until a successor is duly qualified, unless suspended or removed." The argument addressed to us is that the phrase, " all persons elected or appointed," as used in the last clause of the section,

means exactly what the same words signify in the first clause of the section ; that as there used they relate only to two classes of persons, viz.: those required to give security, which class does not include aldermen ; and those not required to give security, but appointed and confirmed, which class again does not include aldermen.  If we conceded to the identity of language the claimed identity of meaning, the argument would still be unsound, for, in addition to the two classes of persons referred to, and in which aldermen were not embraced, there is still a third class, in which aldermen are included, and which consists of those officers, the beginning of whose terms is in the act or by its force, " otherwise provided."   So that the first clause of the section does in fact cover and relate to aldermen, and probably to all charter officers, without exception.  Those whose terms are fixed in their commencement by other provisions of the act ; those who are required to give security ; and those who are not, but have been appointed and confirmed, probably embrace the entire range of charter officers.   The beginning of the aldermen's terms was fixed by the act of 1870, through the reference therein made to the existing provisions of law. Their terms began " when elected," and they were thus included in the first clause of the section and referred to by the phrase, " except as herein otherwise provided."  (Laws of 1855, chap. 101, § 1.)  But independently of this suggestion, we are convinced that the phrase, " all persons elected or appointed," in the second clause of the section, was intended to be just as broad and sweeping as its language indicates.   No practical or sensible reason can be given why it should not apply to all alike, and its ordinary and obvious meaning should be adhered to.   It purports to establish a uniform and useful rule, and we do not feel at liberty, by very close and doubtful criticism, to narrow or limit its operation.

But it is further contended that the provisions of the amendatory act of 1880, with reference to the short and fragmentary term of 1881, are inconsistent with the general provision under discussion, and the latter is, therefore, repealed by section 46 of the act of 1880, which in terms repeals all acts and parts of acts incon-

sistent with or repugnant to its own provisions. The argument
in favor of this proposition derives some force from the language
of the act, but none from the reason or necessity of the situa-
tion. Section 7 is principally devoted to fixing the terms of the
aldermen. No general or fundamental change was intended.
A two years' term was sought to be preserved, and the only
changes made grew out of the altered date of the election. It
was thereupon provided, on the 27th of February, 1880, a few
days before the regular charter election, as follows, viz.: *First,*
that one alderman in each ward should be chosen at the gen-
eral election in November, 1880, to hold office for two years,
or to November, 1882. We may call these, for convenience,
aldermen of the first class. But that left a gap in such class
from March to November, 1880, which was filled by allowing
the usual March election under the charter to proceed, but
abridging the terms of the thirteen thus elected from two years
to the fragmentary period from March, 1880, to November of
that year. We may call these short term aldermen of the first
class. Their term of office was thus described, viz. : "shall
hold their said offices *until their successors are elected at the
general election in November next, and are qualified according
to the provisions of this act.*" Thus, one-half of the alder-
men were so arranged as to preserve an unbroken succession of
the thirteen constituting the first class. *Second.* But thirteen
more were to be provided in proper order, whom we may call
aldermen of the second class. These already existed as such.
They had been elected in March, 1879, and could serve, until
March of 1881. But here came another gap resulting from
the changed date of the election, extending from March, 1881,
to the regular election in that year. To fill that gap it was pro-
vided that at the general election in November, 1880, one
alderman from each ward should be chosen, " who shall each
hold his office from the second Tuesday of March, 1881, *until
the Tuesday* succeeding the second Monday in November,
1881." We may call these, short term aldermen of the sec-
ond class. A correct understanding of these details enables us
to appreciate fairly the argument founded upon the language

1883.]        PEOPLE, ex rel. WOODS, v. CRISSEY.        631

Opinion of the Court, per FINCH, J.

of the statute.   It is contended that the holding of the short
term aldermen of the second class, of whom Morrissey was
one, was absolutely and arbitrarily fixed as extending " *until* "
November, 1881 ; · that the use of the word " until" nega-
tives any possible authority to hold longer, and is inconsist-
ent with a right to hold over; that the grant of such authority
to the short term aldermen of the first class, and the omission
to grant it to the short term aldermen of the second class in-
dicates the legislative intent to withhold it from the latter;
and that the similar omission as to the aldermen of the first
class chosen for the full two years, which seems fatal to the
construction claimed, is explainable by reference to the laws
of 1855, describing their term as " for two years from the
time of their election and until their successors are elected."
We are not satisfied that section 7 of the act of 1880 is in
any respect inconsistent with section 6 of the charter.   Both
can stand together by a natural and reasonable construction.
Section 7 has but one obvious purpose, and that is to fix terms
of office.   It does not purport to legislate upon the rights of
the officer after the constituted term has ended.   That legisla-
tion was the purpose of section 6 of the charter.   The two
enactments, therefore, related ˌto different subjects and must
be construed accordingly: one fixes the lawful term; the other
defines a right springing when that lawful term has ended.
When, therefore, section 7 dictated a full term it could and did
describe it as for two years; but when it came to define a term
running for only a fraction of a year it had to describe it ex-
plicitly by dates.   The termini could in no other manner be
accurately stated.   It must run from one date until another,
and the use of the word " until" is in the sense of " to," de-
noting the running of the term from one point of time to
another.   It is a forced construction to argue out of it a ·pro-
hibition against holding over after the constituted term has
ended.   So far we find no difficulty; but the further inquiry
why the language relating to the short term aldermen of the
first class, and fixing the end of their term, should be " until
their successors are elected in November next and are qualified

according to the provisions of this act," while that relating to the short term aldermen of the second class is "until the Tuesday succeeding the second Monday in November, 1881," is more difficult to answer. Both parties attempt to do so, each on their own theory of results, but both explanations are about equally unsatisfactory. On one side it is said that as aldermen of the short term for the first class became so by an abridgment of the full term they would otherwise have had, it was thought best to extend the term, as a term, to the election and qualification of successors. While we admit the fact, we do not quite see the explanation. On the other side it is said the difference of language means that one class may hold over and the other may not. But no shadow of a reason is given for such distinction. Both classes were short term aldermen. Both filled a temporary and fragmentary term. Each sprang from the same necessity, and was of the same length, and no possible reason has been or can be given why one class should hold over and the other not. And then, there is the same omission as to the aldermen of the first class chosen for a full term. It is not denied that they could hold over, but if so it must be by force of section 6 as operative and unrepealed; for that section in the charter of 1870 took the place of and became a substitute for the provision cited from the law of 1855. That enabled an alderman to hold over only until a successor was "elected." Section 6 enables him to hold over until " a successor is duly qualified." That section covers the whole subject, and became the substituted rule, and if repealed by the same omission, as in the case of short term aldermen of the second class, the aldermen for a full term cannot hold over. The inconsistency alleged would reach both the substitute and its original. But we need not pursue the inquiry. A repeal by implication because of inconsistency or repugnancy should never be declared where a reasonable construction will harmonize statutes alleged to be conflicting. That is easily done here. Both may stand together, upon the ground already indicated, that they relate to different subjects, and so do not come in collision: that one fixes constituted terms and purports to

do nothing more; while the other establishes rights outside of such terms and after they are ended. We are unable to say, therefore, that section 6 of the charter is repealed as to the short term aldermen of the second class.

But at the election in 1881 Morrissey's title, thus far sustained, received another blow. Fleming, who had abandoned his legal proceedings to ascertain and declare the result of the election, and during the whole year had taken no seat in the common council, nor even sought to act as alderman, resigned, the night before the election. On the next day, fifty-five votes were cast for Thomas Fleming for alderman of the seventh ward "to fill vacancy." No public notice of his resignation, or of any vacancy in the office, or of an election to fill any such vacancy, was given; nor did the common council of said city direct any election to be held to fill such vacancy. This occurred on the 7th of November, 1882. One week later, a special meeting of the common council was held under the call of the mayor, "for the purpose of canvassing the votes cast for mayor and school commissioners." At this meeting De Freest, who was then city clerk, read the resignation of Fleming, and announced the casting of fifty-five votes for him to fill vacancy: the president of the common council declared that, having been so elected, he was entitled to qualify and take his seat; the oath of office was administered and filed with the city clerk; and Fleming acted as an alderman, "against the protest of some of the aldermen;" and then the old board adjourned *sine die*, that being its last meeting. Immediately after its adjournment, the new mayor, upon an affidavit charging De Freest with misconduct, by an order in writing, suspended him from office; then nominated and appointed John H. O'Brien city clerk *pro tem. ;* by him the roll of new members was called and thirteen answered to their names, of whom six were old members, and seven newly elected; the seven took the oath of office before O'Brien as notary public, which he in fact was, and filed their oaths in the office of the city clerk; Morrissey appeared and took his seat as alderman of the seventh ward, his associates consenting, and with him fourteen being

present; and thereupon Magill and Craig were elected police commissioners for a term of four years. The mayor at the same meeting nominated Edwin A. King for city clerk, and by vote of the fourteen it was declared confirmed. Did these events destroy or affect Morrissey's right to act as alderman under the statute permitting him to hold over? Fleming declared that he resigned his office. He held none which he could resign. He stood simply in the attitude of a claimant without a certificate and who could not qualify. The sole effect of his resignation was upon himself as a contestant. He resigned and abandoned his claim, and the night before the election, Morrissey, already alderman by holding over, found the contest of the election formally abandoned, and his right to his seat freed from a hostile title. Whatever else Fleming might do, he could no longer contest Morrissey's title by setting up his own. But he went upon the ground of a vacancy. There was one by reason of the failure to elect, but not by reason of Fleming's resignation. Although it has been held in special instances that the term "vacancy" relates only to cases where officers have been duly elected, and not to those where there has been a failure to elect (*People, ex rel. Simpson, v. Van Horne,* 18 Wend. 518; *Hayden* v. *Bucklin,* 9 Paige, 512), yet that construction cannot apply here, since the legislation respecting the election of aldermen of Troy specifically defines a failure to elect as one cause of a vacancy. (Laws of 1855, chap. 101, § 6.) But if for that reason we must hold that a vacancy in a legal sense existed, still the only mode of filling it was by an order of the common council directing an election to be held to fill it, and determining the time and place. (Laws of 1816, chap. 131, § 5; Laws of 1854, chap. 293, § 2; Laws of 1855, chap. 101, § 4.) Such election is a special one to fill out a remnant of a constituted term, and cannot be held except by order of the common council.

There can be no election without some valid authority behind it. A few voters putting tickets in a box does not alone make an election. Here, no order of the common council was made, and there was no election to fill a vacancy. All that there was

1883.]    PEOPLE, ex rel. WOODS, v. CRISSEY.    635

Opinion of the Court, per FINCH, J.

appears to have been a stratagem and artifice. The voters knew nothing of it. They made no choice. Fifty-five persons tried to appoint Fleming alderman. He was not elected, for that implies opportunity to reject or choose another, and such was not given. It is a misnomer to call such a proceeding an election. It was a nullity. (*Rex* v. *Gaborian*, 11 East, 77 ; *Foster* v. *Scarff*, 15 Ohio, 532 ; *Secord* v. *Foutch*, 44 Mich. 89 ; *Beal* v. *Ray*, 17 Ind. 554; *People, ex rel. Smith*, v. *Peck*, 11 Wend. 604.) The case of *People, ex rel. Davies*, v. *Cowles* (3 Kern. 350) decides no contrary doctrine. There an authority stood behind the election and commanded it, and no less an authority than the Constitution itself. And there, too, the existence of the vacancy was publicly known, conventions made their nominations, and fifty. thousand votes were cast. There was no trace of artifice or fraud, and no defect except the formal one of no notice by the secretary of State, which, in that instance, it was impossible to give according to law. The case here is entirely different ; and we do not think it right to recognize as an election and as the foundation of an official title such a proceeding as the one before us ; what is called an election was not such, and can have no possible effect upon the rights of the parties ; and what occurred at the last meeting of the old board is immaterial, since nobody is here claiming or denied any right through a vote cast by Fleming on that occasion.

The meeting, therefore, of the quorum of fourteen on the occasion of the appointment of Magill and Craig as police commissioners was a lawful meeting and lawfully constituted ; for there is no merit in the remaining objection that the seven newly-elected members did not lawfully take the oath of office, since O'Brien was not legally city clerk and could not administer that particular oath as notary public. The action of these seven aldermen in voting for police commissioners would have been valid if they had taken no oath. (*In re Kendall*, 85 N. Y. 305; *Foot* v. *Stiles*, 57 id. 401 ; *Weeks* v. *Ellis*, 2 Barb. 320.) These cases decide that the officer elected and who by the certificate of the proper authority to that effect, is or has become duly. qualified to hold the office, is the rightful officer

although holding by a 'defeasible title when he does not take the oath of office. That omission may work a forfeiture, but unless and until such forfeiture is adjudged, he remains the rightful officer as if he had taken the proper oath. There is no room, therefore, for the suggestion that the predecessors of the seven newly-elected aldermen held over because of the irregular oath. That there were such predecessors is argued out for us from the fact that twenty-five members met on the 11th of November, 1880; but granting that, we still do not know that the seven newly-elected members were not the same identical persons who were their predecessors. Each may have been re-elected and his own successor, so that the seven newly-elected may have been the very same persons who are claimed to have been aldermen by holding over. But if somewhere in the facts there is proof, which we have not discovered, which surmounts the difficulty, the fact remains, that the new officers were "duly qualified" without having taken the oath, and so became the lawful aldermen, until forfeiture, and their predecessors could not hold over. The double sense which belongs to the word "qualified," meaning in the statute the condition or *status* of the officer, while also often used to describe his act of taking an oath, must not be allowed to mislead or confuse us. The oaths taken by the aldermen were filed with King as city clerk, and it is claimed that DeFreest remained such. We think not. The mayor first suspended De Freest. That did not vacate his office, nor amount to a removal. The Charter invariably distinguishes between a suspension and removal. The former does not take away the office, but stops for the time being the right to perform its duties. But the city clerk, having no fixed term of service, could be removed at pleasure by the proper appointment of a successor. (*The People, ex rel. Whiting,* v. *Carrique,* 2 Hill, 98, and per BRONSON, J., 104.) When King was nominated and confirmed that terminated DeFreest's office as city clerk, and King became the lawful officer, so that the oaths of office of the aldermen and of the commissioners were properly filed with him. The question raised, that O'Brien and King could not be appointed until after

their salaries were fixed by a two-thirds vote, is answered by the fact that we do not know that they were not already fixed when the appointments were made.   The office of city clerk existed under the charter of 1870, and the salary of that office may have been and probably was fixed long before the act of 1880, because the provision in the latter act that " the compensation or salary of any officer shall be fixed before his appointment " (§ 10) was not new, but existed in similar terms in the charter of 1870. (Title 3, § 5.)   We must assume that it was obeyed, and that the salary of the city clerk was fixed even before 1880. We cannot even say that it was not so fixed by a two-thirds vote and at a sum less than $600.   Section 43 of the latter act does not mean that a salary once properly attached to an office by a two-thirds vote and within the prescribed limits needs to be again fixed before every new appointment.   It is of no consequence, therefore, that the affidavit tells us that the salary of the city clerk has not been fixed since 1880.   We have thus gone through the principal objections taken to the title of Magill and Craig.   We think they were lawfully appointed and rightfully hold their office.

It remains to consider the case of Hydorn, whose title is assailed by reason of the order suspending him, made by Mayor Murphy.   While Hannon, Magill, Cavanaugh and Hydorn were organized and acting as a board of police commissioners, and on the 28th day of May, 1881, the mayor of Troy, upon affidavits charging official misconduct, made an order suspending Hydorn from office.   This was done under the authority supposed to be conferred on the mayor by section 3 of chapter 30 of the Laws of 1880.   That section provides that the mayor shall " have power to suspend any officer appointed or confirmed under the provisions of this act for misconduct in office or neglect of duty, to be specified in the order of suspension, and he shall, within ten days, convene the common council, of which he shall be the presiding officer, and the said common council, so constituted, shall have power to hear and determine said charges, and if found to be true, to remove the said officer from his office by a vote of two-thirds of the said common council so constituted ; but no such removal

shall be made without reasonable notice to the officer complained of and an opportunity to be heard in his defense." But in 1881, and before the suspension of Hydorn, an act was passed (Chap. 76, § 1) which provided for the removal of a police commissioner by the Supreme Court on written charges duly verified and made by any citizen of Troy, and providing for notice to and a trial of the accused officer, and enacting that " the Supreme Court of this State shall have sole and exclusive jurisdiction and power to *remove* such police commissioners from office." The mayor, having issued his order of suspension, convened the common council under the act of 1880 to hear and determine his charges. Twenty-three aldermen appeared, and Hydorn answered specially, protesting against the jurisdiction of the common council to try him. That body determining to proceed, Hydorn procured from the Supreme Court and served an alternative writ of prohibition forbidding, until further order, the common council from proceeding to hear and determine said charges. That case is still pending and has not been argued. So that from May, 1881, down to November of 1882, or for about a year and a half, Hydorn remained under the order of suspension and without trial. In November of 1882 the new mayor made an order, reciting the facts, in which he revoked, withdrew, and canceled the former order suspending Hydorn. If the mayor had power thus to revoke the order of his predecessor, so far as it suspended Hydorn, we might escape any discussion of the much graver and more serious question whether the act of 1881, giving to the Supreme Court exclusive jurisdiction for the removal of police commissioners, necessarily repealed, by implication, the mayor's authority to suspend them. But the importance of the question to the government of the city and the safe movement of its municipal machinery seems to demand of us a determination, not wholly founded upon the mayor's revocation. It is clear that, so far as the removal of a police commissioner is concerned, the power of the common council is gone. Not only does the act of 1881 cover the same subject as that of 1880, and dictate a mode of trial and removal entirely different and by another tribunal,

but the statute expressly confers upon such new tribunal exclusive jurisdiction over the removal of the police commissioners. The language and the intention are equally plain, and must be held to deprive the common council of any authority to try and remove the accused commissioner. The two systems as a whole cannot stand together, and it remains to consider whether the power of suspension survived the change. That power was given, not as a distinct and separate authority, but as an incident and aid to the common council's power of removal. It could be exercised in no other way and for no other purpose. It limited the mayor's authority to a period of ten days, after which jurisdiction passed to the common council. If within the ten days he did not convene the board as a trial court the suspension probably ended at their close. His order was required to contain the charges against the accused, and was operative only on that condition. It seems, therefore, that in the scheme of the statute, the order of suspension is an essential and necessary part of the mode of removal, and so interwoven with, and dependent upon it that it cannot stand alone. The two modes of removal in their completeness cannot exist together. The question now is, whether any remnant of the wreck of the one can stand with the complete system of the other. The effort appears to us vain, and leading to inconsistencies and absurdities. If the mayor can suspend, he must convene the common council for a trial, but when convened it cannot try, and is without jurisdiction, and if the suspension does not instantly end, the officer is suspended indefinitely, and what was intended as a temporary suspension for ten days becomes practically a removal. And thus what was meant to be temporary becomes permanent; the process framed to begin a proceeding is turned into final judgment and execution; an incidental authority becomes a lasting and arbitrary power; suspension is transformed into practical removal; and that without power in the officer to defend against the charges and so end the suspension by acquittal. For both reasons section 30 of the act of 1880 relating to suspension and removal must be deemed repealed. The later statute

covers the ground of the earlier and is intended to furnish the whole law; and is inconsistent with and repugnant to the earlier provisions.

The objections to the title of the act of 1881 are sufficiently answered by reference to recent decisions of this court. (*People, ex rel. City of Rochester,* v. *Briggs,* 50 N. Y. 553; *Kerrigan* v. *Force,* 68 id. 384; *In re Met. Gas Co.,* 85 id. 526.)

It follows from these views that Magill, Craig and Hydorn were lawfully police commissioners of the city of Troy when the warrant was drawn, and the comptroller should countersign the same.

The orders of the Special Term and of the General Term should be reversed, with costs, and a peremptory *mandamus* issue, requiring the comptroller to countersign the warrant drawn in favor of the relator.

All concur, except RUGER, Ch. J., and MILLER, J., dissenting, RAPALLO, J., concurring in result.

Ordered accordingly.