(6 App. Div. 277)

## RATHBONE et al. v. WIRTH et al.

(Supreme Court, Appellate Division, Third Department.    June 2, 1896.)

1. CONSTITUTIONAL LAW—LOCAL SELF-GOVERNMENT.

Laws 1896, c. 427, § 1, creates a board of four police commissioners for the city of Albany, to be elected by the common council, and provides that not more than two of them shall belong to the same political party; that, for the purpose of such election, the members of the council attending the meeting shall constitute a quorum; that each member of the council shall be entitled to vote for not more than two commissioners; that, if a vacancy shall occur in the board of police commissioners, it shall be filled by appointment by the mayor, on the written recommendation of a majority of the members of the common council belonging to the same political party as the commissioner whose office shall become vacant; and that no person shall be eligible to the office of police commissioner unless he is a member of the political party having the highest or the next highest representation of the common council. *Held*, that such statute is unconstitutional, in that it infringes the rights of the majority to govern by giving the minority equal power in the selection of police commissioners with the majority.    Landon, J., dissenting.

2. SAME—POWER OF LEGISLATURE—METHOD OF SELECTING OFFICERS.

The power of the legislature to determine the method of filling a newly-created office does not go to the extent that a method may be prescribed by which the right of the majority of the electors to select the officer will be defeated.

3. SAME—SOURCES OF SOVEREIGN POWER.

The sovereign power of the people does not exist by virtue of the constitution, but the authority of the constitution is derived from the people.    Landon, J., dissenting.

4. SAME—LOCAL AUTHORITIES—ALDERMEN.

Under the Albany city charter, conferring various powers on the common council, but none on the individual members thereof, the individual members are not "authorities," within Const. art. 10, § 2, which provides that all city officers whose election or appointment is not provided for by the constitution shall be elected by the electors of the city, or be appointed by such authorities thereof as the legislature may designate for that purpose.

5. SAME—MINORITY.

Laws 1896, c. 427, which provides that, of the four police commissioners of the city of Albany, two shall be of the political party having the highest representation in the city council, and two shall be of the party having the next highest representation, cannot be sustained on the ground that it secures minority representation, as it puts the minority on an equality with the majority.

6. SAME—PRESUMPTION TO SUSTAIN STATUTE.

Where a statute creating a new city office directs the common council to make appointments in a certain manner, in violation of the constitution, it will not be presumed that the council will ignore the unconstitutional provision.

7. SAME—ADMISSION OF INTENT TO ACT UNDER STATUTE.

Where defendants, in an action to enjoin the enforcement of a statute alleged to be unconstitutional, assert the constitutionality of the statute, and admit that they are going to do the things sought to be restrained, the constitutionality of the statute is directly raised, and a determination of the question is necessary to a decision of the case. People v. Crissey, 91 N. Y. 616, distinguished.

8. SAME—PRACTICAL CONSTRUCTION OF LEGISLATIVE POWER.

. A statute cannot be sustained on the ground that the power of the legislature to enact it has been practically construed by the enactment of previous statutes of the .same character, unless such legislation has been uniform, and its validity acquiesced in.

Appeal from special term, Albany county.

Action by John F. Rathbone and George Douglas Miller against Jacob Wirth, Jr., and others, to procure an adjudication that Laws 1896, c. 427, is unconstitutional; that defendants who are members of the common council of the city of Albany be enjoined from voting for police commissioner under said statute, or doing any other act thereunder; that defendants constituting the board of police commissioners be enjoined from surrendering possession of the police department to persons claiming under said statute,— and for further relief. There was a judgment in favor of plaintiffs, and defendants George W. Smith, Jacob Wirth, Elmer H. Havens, Fred Ebel, George H. Stevens, William H. Golden, John M. Collins, William J. Walker, and John Pauly appeal. Affirmed.

Argued before PARKER, P. J., and LANDON, HERRICK, PUTNAM, and MERWIN, JJ.

Thompson & Andrews (A. L. Andrews and J. Newton Fiero, of counsel), for appellants.

Hale, Bulkeley & Tennant (E. Countryman, Matthew Hale, and Albert C. Tennant, of counsel), for respondents.

John A. Delehanty, for Donovan et al.

HERRICK, J. This is an appeal from a judgment, entered upon the decision of the special term, enjoining and restraining the common council of the city of Albany from electing police commissioners pursuant to the provisions of chapter 427 of the Laws of 1896, and restraining and enjoining the present police commissioners of the city of Albany from delivering or surrendering up any property, belonging to the police department, to any person or persons who may claim to be police commissioners under the provisions of said act. The act in question is an act entitled:

"An act to amend chapter seventy-seven of the Laws of eighteen hundred and seventy, entitled 'An act to amend the "Act to combine into one act the several acts relating to the city of Albany," passed April twelfth, eighteen hundred and forty-two, and the several acts amendatory thereof; and also to repeal the "Act to establish a capital police district, and to provide for the government thereof," passed April twenty-second, eighteen hundred and sixty-five,' and the several acts amendatory thereof, in so far as they relate to the city of Albany, and the acts amendatory thereof and supplemental thereto, relative to the police department." 

By the provisions of this act the existing police commissioners and the entire force of policemen, with the exception of one officer,

are removed from office. The principal portion of the statute brought in question by this action is section 1, being an amendment to section 3 of title 12 of the heretofore existing law (Laws 1870, c. 77, and the acts amendatory thereof). Section 1 reads as follows:

"The police board of the city of Albany shall consist of four police commissioners, not more than two of whom shall belong to the same political party or organization, and who shall be chosen and hold office as hereinafter provided. On the first Monday after the passage of this act, the common council shall meet at eight o'clock in the evening in the common council chamber and shall proceed to elect four persons, residents and freeholders in the city, as such police commissioners, and for the purpose of such meeting the members attending shall constitute a quorum. Each member of the common council shall be entitled to vote for not more than two of such persons, and the four persons receiving the highest number of votes shall be such police commissioners. The common council shall not transact any other business until the said four police commissioners are elected. The commissioners so appointed shall hold office as such until the first day of February, eighteen hundred and ninety-eight. During the month of January, eighteen hundred and ninety-eight, and in each and every second year thereafter, the common council shall meet and proceed in like manner to elect four police commissioners, who shall hold office for two years from the first day of February following. If a vacancy shall occur in said board of police commissioners otherwise than by expiration of term, it shall be filled by appointment by the mayor upon the written recommendation of a majority of the members of the common council belonging to the same political party or organization as the police commissioner whose office shall become vacant. No person is eligible to the office of police commissioner unless at the time of his election he is a member of the political party or organization having the highest or the next highest representation in the common council. The commissioners shall receive no compensation for any services performed by them under the provisions of this act."

It will be observed that the purpose of this act is to make an equal division of the four police commissioners between the two principal political parties, and, as a means of accomplishing that purpose, the individual members of the common council are confined to voting for only two of the four commissioners to be selected, and no citizen is eligible or can be elected as a police commissioner unless he is a member of the political party or organization having the highest or next highest representation in the common council. Of course, if the object sought can be accomplished in regard to the police department, it can be in relation to all departments of city, village, county, and town governments.

The questions raised by this section are so important and far-reaching in their consequences, and so grave and fundamental in their character, that they cannot be adequately discussed within the ordinary limits of a judicial opinion. Whether the provisions of an act are wise or vicious is not for the court to discuss, except as it may be pertinent to illustrate its conformity to or its conflict with the fundamental law. A law, particularly a police law, may be exceedingly well calculated for its object. It may be efficient to preserve law and order. It may be well adapted to secure the physical safety of the citizen, and insure the protection of his property. And yet it may be enacted by a despotic government, and be founded upon principles obnoxious to the spirit of a free people,

and contrary to their institutions. So, also, one may be enacted in entire conformity to such spirit and institutions, and be utterly ineffective to accomplish what should be the primary purpose of such a law. We therefore cannot determine the validity of a law by determining whether it is or is not well adapted to accomplish the purpose for which it purports to be enacted. We can only determine whether it violates the fundamental law. If it does not, our duty ends. We cannot correct mere abuses of power not in violation of the constitution. That must be done by the people. "Every act of the legislature must be presumed to be in harmony with the fundamental law, until the contrary is clearly made to appear." People v. Durston, 119 N. Y. 569–577, 24 N. E. 6, 8. "The law which has received the sanction of the legislature and the approval of the executive should only be held void, as repugnant to the constitution, when the repugnancy is clearly demonstrated." People v. Albertson, 55 N. Y. 50.

While great respect should be paid by us to the action of the legislature, we should also bear in mind that:

"Under our form of government, the legislature is not omnipotent, whatever the parliament of England may be in theory. It is only one of the organs of that absolute sovereignty which resides in the whole body of the people. It has the power, subject to the qualified negative of the governor, to pass any law which it may deem necessary for the public good, not inconsistent with the first principles of government nor contrary to the provisions of the constitution of this state or of the United States." Burch v. Newbury, 10 N. Y. 374–392.

And, in interpreting the power of the legislature under the constitution, we are not confined to the strict letter of that instrument, or compelled to point out the exact article, section, clause, or phrase therein which grants or denies the power in question. There are some things so contrary to the entire purpose and spirit of the constitution that they must be said to be in conflict with it, although it cannot be contrasted with any specific portion of it. The object of its adoption, and its purpose and intent, taken as a whole, must be considered. As has been said by one of the most eminent authorities upon constitutional law in this country (Mr. Justice Cooley):

"If this charter of state government which we call a 'constitution' were all there was of constitutional command; if the usages, the customs, the maxims, that have sprung from the habits of life, modes of thought, methods of trying facts by the neighborhood, and mutual responsibility in neighborhood interests, and the precepts which have come from the revolutions which overturned tyrannies, the sentiments of manly independence and self-control which impelled our ancestors to summon the local community to redress local evils, instead of relying upon king or legislature at a distance to do so, —if a recognition of all these were to be stricken from the body of our constitutional law, a lifeless skeleton might remain. But the living spirit, that which gives it force and attraction, which makes it valuable and draws to it the affections of the people, that which distinguishes it from the numberless constitutions, so called, which in Europe have been set up and thrown down within the last hundred years, many of which, in their expressions, have seemed equally fair and to possess equal promise with ours, and have only been wanting in the support and vitality which these alone can give,—this living and breathing spirit, which supplies the interpretation of the words

of the written charter, would be utterly lost and gone." People v. Hurlbut, 24 Mich. 44.

What has been called "the political tendency of the constitution" may be considered in interpreting it. People v. Porter, 90 N. Y. 68–75. The full measure and intent of the instrument is not always to be found in its mere letter. To again quote Justice Cooley:

"If we may suppose, for an illustration, that the legislature shall provide that, in Detroit, any single person may be chosen, in whom may be vested the whole legislative authority of the city, and all other authority pertaining to local government of every description and nature not expressly by the constitution confided to officers specified, it would require unusual boldness in any one who should undertake to defend such a local dictatorship as something within the competency of legislation under a constitution avowedly framed to guard, protect, and defend the local powers and local liberties." People v. Common Council of City of Detroit, 28 Mich. 228.

To put another illustration: Under the last clause of section 2 of article 10 of the constitution, all offices not in existence at the adoption of the constitution, but that shall thereafter be created by the legislature, may be filled by officers elected by the people, or appointed, as the legislature may direct. Suppose the legislature should see fit to create a new county office, and should provide that, at the general election for the election of state officers, the person for whom the next highest number of ballots should be cast for such office, should thereafter discharge the duties thereof. A new office is created, which the legislature has a right to create and also to determine the method of filling it. There is nowhere any express prohibition against legislation of that character in the constitution, and yet what man will say that an act of that kind would stand for a moment, not because it is in conflict with any express provision of the constitution, but because it is repugnant to its whole spirit and intent. "A written constitution must be interpreted, and effect given to it as the paramount law of the land, equally obligatory upon the legislature as upon other departments of government and individual citizens, according to its spirit and the intent of its framers, as indicated by its terms. An act violating the true intent and meaning of the instrument, although not within the letter, is as much within the purview and effect, of a prohibition, as if within the strict letter; and an act in evasion of the terms of the constitution, as properly interpreted and understood, and frustrating its general and clearly expressed or necessarily implied purpose, is as clearly void as if in express terms forbidden. A thing within the intent of a constitution or statutory enactment is for all purposes to be regarded as within the words and terms of the law. A written constitution would be of little avail, as a practical and useful restraint upon the different departments of government, if a literal reading only was to be given it, to the exclusion of all necessary implication, and the clear intent ignored, and slight evasions, or acts palpably in evasion of its spirit, should be sustained as not repugnant to it. The restraints of the constitution upon the several departments, among which the various powers of government are distributed, cannot be lessened or diminished by inference and implication; and usurpa-

tions of power, or the exercise of power in disregard of the express provision or plain intent of the instrument, as necessarily implied from all its terms, cannot be sustained under the pretense of a liberal or enlightened interpretation, or in deference to the judgment of the legislature, or some supposed necessity, the result of a changed condition of affairs." People v. Albertson, 55 N. Y. 50–55.

Constantly keeping in view, then, the rules for constitutional interpretation above set forth, and that respect for co-ordinate branches of the government which requires us to presume that an act that has been passed by the legislature and sanctioned by the governor is in conformity with the constitution, and that the legislature and chief executive of the state are absolute judges of the propriety and wisdom of legislation, untrammeled by judicial opinion or interference, so long as such legislation is within the limits of the constitution; but also bearing in mind that, as to whether such legislation is within constitutional limits, the judiciary are the absolute judges, untrammeled by executive or legislative opinion, and that it is within its power, as it is its duty, to declare such legislation void when it transcends the limits of the constitution, and that "it is only by the free exercise of this power that courts of justice are enabled to repel assaults, and to protect every part of the government and every member of the community from undue and destructive innovations upon their chartered rights" (1 Kent, Comm. *450),—let us proceed to consider the purpose of section 1 of this act, and the means devised for carrying that purpose into effect.

1. As to the purpose of the section: Prior to the passage of this act, the police commission of the city of Albany consisted of five members,—the mayor of the city ex officio, and four persons appointed by him, without regard to their political affiliations. Laws 1870, c. 77, tit. 12, § 3, as amended by Laws 1892, c. 99, § 1. It is obvious that, under this law, the board could not be equally divided between the leading political parties. If there was no other reason, the number prevents an equal division. The obvious intent—the expressed purpose—of this act is to divide the police commission equally between the parties having the highest and next to the highest representation in the common council. That is to place the minority upon an equality with the majority, and to give the majority no more power than the minority. This is in violation of the fundamental laws of a republican form of government. A written constitution presupposes the existence of sovereign and absolute power. It regulates the exercise of that power, and limits and restricts it, but does not create it. In this country that sovereign and absolute power is the people. In the language of James Wilson, the most profound lawyer and student of government in the continental congress, and in the convention that framed the federal constitution:

"With us no prerogative or government can be set up as co-equal with the authority of the people. The supreme power is in them: and in them, even when a constitution is formed, and government is in operation, the supreme power still remains. A portion of their authority they indeed delegate; but

they delegate that portion in whatever manner, in whatever measure, for whatever time, to whatever persons, and on whatever conditions they choose to fix." 1 Wilson's Works, p. 439.

The people receive no power or authority from the constitution. The authority of the constitution is derived from them. The supreme power of the people does not arise from the constitution, or exist by virtue of it. It existed prior to it. It makes and unmakes constitutions, but is not made by them. Consequently, we are not to look into the constitution for any grant of power to the people, or any definition of their powers. They possess all that they have not surrendered by the constitution. One of the primary purposes for the adoption of a written constitution is the protection of minorities and individuals from the exercise of absolute power. Burlam. Nat. 249. For that purpose the people have yielded up some of their powers, but they retain all that they have not restricted themselves from exercising by the express words of the constitution or by necessary implication therefrom. Under our form of government, that supreme power is vested in and exercised by the majority, and for all practical purposes the majority are the people. The principle that the majority shall govern lies at the very basis of our government. Among the rights of the majority, as a part of its sovereign power, is the right to select officers, either directly by election, or indirectly by authorities or officers whom they have chosen by election. This power of the majority to select their officers has never been surrendered up by the people, excepting in the one instance where provision is made in the constitution for the passage of a law which shall secure equal representation among the election officers of the two political parties, which at the next preceding general election cast the highest and the next highest number of votes. Const. art. 2, § 6. At the parting of the ways, where it is to be determined who constitute the majority and who the minority, it is eminently proper that the majority and the minority as theretofore existing shall be equally represented. The provision for such equal representation in this one case by implication excludes it in all others. As was stated by Chief Justice Savage:

"The constitution, by authorizing the appropriation of private property to public use, impliedly declares that for any other use private property shall not be taken from one and applied to the use of another." In re Albany St., 11 Wend. 148.

This presumption is strengthened by the fact that propositions by which it was proposed to place in the constitution provisions under which the legislature might provide for minority representation were, after a very full discussion, voted down. Debates of Const. Conv. 1894, pp. 1580–1621. Election by plurality vote, where there are several persons voted for for the same office, and no one has a majority of the total vote, but the one receiving the highest number of votes is awarded the office, is neither a violation of nor an exception to the principle of majority rule, but rather a recognition of the principle; he who is the choice of the greatest number of people being

recognized as the representative of the people. This power of the majority to govern the legislature cannot take from them. The legislature exercises the legislative power of the people. It is their agent for that purpose, but it cannot limit or surrender any of the power or authority of its principals.

But it may be said that the legislature is composed of the representatives of the people, and that therefore their acts are presumed to be the acts of a majority of the people, and that, while this act deprives the majority of the people in one locality of their power, still it is in accordance with the will of the majority of the people of the whole state, and that thereby the principle of majority government is recognized. There would be force in that suggestion if it was not for another principle of our government, recognized by our constitution, and if the people had not by the constitution limited their power to override the will of a majority in any locality. The principle I refer to is the principle of local self-government. "The principle of local self-government is regarded as fundamental in American political institutions. It means that local affairs shall be decided upon and regulated by local authorities, and that the citizens of particular districts have the right to determine upon their own public concerns and select their own local officials without being controlled by the general public or the state at large. For this purpose municipal corporations are established, and are invested with rights and powers of government, subordinate to the general authority of the state but exclusive within their sphere. It is axiomatic that the management of purely local affairs belongs to the people concerned, not only because of being their own affairs, but because they will best understand and be most competent to manage them. The continued and permanent existence of local government is therefore assumed in all the state constitutions, and is a matter of constitutional right, even when not in terms expressly provided for. It would not be competent to dispense with it by statute. The institution of local self-government is not an American invention, but is traditional in England, and is justly regarded as one of the most valuable safeguards against tyranny and oppression. It is but an extension of this idea that the government of the United States should be intrusted with only such powers and rights as concern the welfare of the whole country, while the individual states are left to the uncontrolled regulation of their internal affairs." Black, Const. Law, 373, 374. See, also, 1 Dill. Mun. Corp. p. 48; 1 Beach, Pub. Corp. p. 48; Landon, Const. Law, 319 et seq.

Local self-government is the school which fits people for self-government. Local self-government is the result, and also the most efficient preserver, of civil liberty. Lieber treats of its importance and speaks of it as the "corollary of civil liberty." Lieb. Civ. Lib. c. 21. De Tocqueville, one of the most intelligent observers of our form of government, attributed its success and our capacity for self-government to our distribution of governmental powers among the small political subdivisions of the state, and the exercise of those powers by the people of the locality, and, in speaking of it, he remarked:

"Local assemblies of citizens constitute the strength of free nations. * * * Municipal institutions are to liberty what primary schools are to science. They bring it within the people's reach. They teach men how to use and how to enjoy it. A nation may establish a system of free government, but without the spirit of municipal institutions it cannot have the spirit of liberty." M. De Tocqueville's Democracy in America, c. 5. See, also, Jefferson's Letters to Samuel Kerchival, Vol. 7 (Washington's Ed.) Jefferson's Works.

Justice Brown, in his dissenting opinion in the case of People v. Draper, 15 N. Y. 532, expressed himself upon this subject as follows:

"Wherever the Anglo-Saxon race have gone, wherever they have carried their language and laws, these communities, each with a local administration of its own selection, have gone with them. It is here they have acquired the habits of subordination and obedience to the laws, of patient endurance, resolute purpose, and the knowledge of civil government, which distinguish them from every other people. Here have been the seats of modern civilization, the nurseries of public spirit, and the centers of constitutional liberty. They are the opposites of those systems which collect all power at a common center, to be wielded by a common will, and to effect a given purpose,—which absorb all political authority, exercise all its functions, distribute all its patronage, repress the public activity, stifle the public voice, and crush out the public liberty,"—cited and approved in State v. Denny, 118 Ind. 382, 21 N. E. 252.

While the above language was used in a dissenting opinion, there was no division in the court upon the principle of local self-government, but it was held, as I shall have occasion to call attention to hereafter, that under our constitution it did not apply to that case. The principle is one that runs through our entire system of government, from the road and school district up to the federal government.

The right of cities to govern themselves has been the subject of attack by arbitrary power from a very early period. It appears to have been one of the abuses complained of by the barons in England prior to the granting of the Great Charter, for we find that instrument, after providing that the city of London should have all its ancient liberties and free customs, also provides, in the sixteenth article, as follows:

"Furthermore, we will and grant that all other cities and buroughs and towns and ports shall have all their liberties and free customs."

They were also the subject of attack by Cromwell in the height of his power. Charles II. sought to coerce them to his will, and James, in innumerable instances, removed the local officers, and directed the election of others in their place, who were expected to be more subservient to his wishes. His efforts culminated in causing the charter of the city of London to be revoked by a servile court. In this country excess of partisanship has caused efforts to be made from time to time by both of the leading political parties either to control localities by the use of legislative power, or to neutralize and destroy the power of those dominant in a particular locality, where they have not been in accord with the dominant party in the state, and sometimes even where, though of the same party, they were not in accord with the controlling element of that party. In these efforts the principles of our government have been lost sight

of, and the attempt has been to make the governments of many of our cities governments of men, and not of law or principles. This principle has been the subject of investigation by the courts of some of our sister states, and, whatever has been their decisions in the particular cases under consideration, they have been, so far as I have been able to discern, unanimous in holding that it is an inseparable part of our American system of self-government. In the case of People v. Hurlbut, 24 Mich. 44, Justice Cooley expressed himself in part as follows:

"And the question, broadly and nakedly stated, can be nothing short of this: Whether local self-government in this state is or is not a mere privilege, conceded by the legislature in its discretion, and which may be withdrawn at any time at pleasure? I state the question thus broadly because, notwithstanding the able arguments made in this case, and after mature deliberation, I can conceive of no argument in support of the legislative authority which will stop short of this plenary and sovereign right. * * * We have taken great pains to surround the life, liberty, and property of the individual with guaranties; but we have not, as a general thing, guarded local government with similar protections. We must assume either an intention that the legislative control should be constant and absolute, or, on the other hand, that there are certain fundamental principles in our general framework of government, which are within the contemplation of the people when they agree upon a written charter, subject to which the delegations of authority to the several departments of government have been made. That this last is the case appears to me too plain for serious controversy. The implied restrictions upon the power of the legislature, as regards local government, though their limits may not be so plainly defined as express provisions might have made them, are nevertheless equally imperative in character; and, whenever we find ourselves clearly within them, we have no alternative but to bow to their authority. The constitution has been framed with these restrictions in view, and we should fall into the grossest absurdities if we undertook to construe that instrument on a critical examination of the terms employed, while shutting our eyes to all other considerations. The circumstances from which these implications arise are: First, that the constitution has been adopted in view of a system of local government, well understood and tolerably uniform in character, existing from the very earliest settlement of the country, never for a moment suspended or displaced, and the continued existence of which is assumed; and, second, that the liberties of the people have generally been supposed to spring from and be dependent upon that system. * * * The state may mold local institutions according to its views of policy or expediency; but local government is matter of absolute right, and the state cannot take it away. It would be the boldest mockery to speak of a city as possessing municipal liberty where the state not only shaped its government, but at discretion sent in its own agents to administer it, or to call that system one of constitutional freedom under which it should be equally admissible to allow the people full control in their local affairs, or no control at all. What I say here is with the utmost respect and deference to the legislative department, even though the task I am called upon to perform is to give reasons why a blow aimed at the foundation of our structure of liberty should be warded off. Nevertheless, when the state reaches out, and draws to itself and appropriates the powers which from time immemorial have been locally possessed and exercised, and introduces into its legislation the centralizing ideas of continental Europe, under which despotism, whether of monarch or commune, alone has flourished, we seem forced back upon and compelled to take up and defend the plainest and most primary axioms of free government, as if even in Anglican liberty, which has been gained step by step, through extorted charters and bills of rights, the punishment of kings and the overthrow of dynasties, nothing was settled and nothing established."

The same principle was reaffirmed in the case of People v. Common Council of Detroit, 28 Mich. 228; Attorney General v. Detroit

Common Council, 58 Mich. 213, 24 N. W. 887. See, also, Caldwell v. Justices, 4 Jones Eq. 323.

In the case of City of Evansville v. State, 118 Ind. 427, 21 N. E. 267, it was held that the right of local self-government existed prior to the adoption of the constitution, and was not expressly yielded up or granted to any of the departments of the state government by that constitution, which on the contrary was framed with reference to the then existing local governments, and that the right of self-government still belongs to the people of the municipalities of the state. To the same effect, see State v. Denny, 118 Ind. 382, 21 N. E. 252.

In our own state it seems to me the subject has been placed beyond question. All through our state constitution this principle of local self-government is recognized. People v. Porter, 90 N. Y. 68. It is emphasized by section 2 of article 12 of the constitution, which provides that before any bill for a special city law, relating to a city, can become a law, it must, after it has passed both branches of the legislature, be submitted to the city authorities of such city for their approval or rejection, and cannot become a law in case of rejection by them, until it has again passed both branches of the legislature, and been signed by the governor; and it culminates in section 2 of article 10, which reads that:

"All county officers whose election or appointment is not provided for by this constitution. shall be elected by the electors of the respective counties or appointed by the boards of supervisors, or other county authorities, as the legislature shall direct. All city, town and village officers whose election or appointment is not provided for by this constitution shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof, as the legislature shall designate for that purpose."

Speaking of the same section in the constitution of 1846, Justice Andrews said:

"The obvious purpose of the provision of the constitution which has been quoted was to secure to the people of the cities, towns, or villages of the state the right to have their local offices administered by officers selected by themselves." People v. McKinney, 52 N. Y. 374–378.

This section, as it existed under the former constitution, has been under consideration upon several occasions. People v. Draper, 15 N. Y. 532; People v. Shepard, 36 N. Y. 285; People v. Pinckney, 32 N. Y. 377; People v. Albertson, 55 N. Y. 50. The force of the provisions of the constitution for the preservation of local self-government, by providing for the election of local officers by the people of the localities, or for their appointment by local authorities, was recognized, and the validity of the acts then in question were sustained, on the ground, in the Cases of Draper and Shepard, that new political divisions of the state had been created, and that, as to such new divisions, the provisions of the constitution under consideration did not apply; in the Case of Pinckney, that the offices created by the act were new ones, not in existence at the enactment of the constitution, that they were public and not local offices, and for both reasons they were not within the meaning of the statute. But neither the Draper nor Shepard Case, I think, can any longer be con-

v.40n.y.s.no.5—35

sidered authority in this state, since the decision of the case of People v. Albertson, 55 N. Y. 50. The justice who wrote the prevailing opinion in that case said, in relation to the Draper Case, that it was to be hoped that—

"In the interests of constitutional government by the people, that the occasion to reaffirm its doctrines may never arise. To my mind the dissenting opinion of Judge Brown, concurred in by Judge Comstock, presents unanswerable arguments why the decision should have been different."

And the reasons of his opinion, all through, are in direct conflict, upon principle, with the decisions of both the Draper and Shepard Cases. This opinion was concurred in by all of the judges of the court except one, who based his dissent expressly upon the decisions rendered in the Draper and Shepard Cases, thus pointing the concurrence of the other judges in the reasoning and language used by the judge who wrote the prevailing opinion.

In discussing the section of the constitution now under consideration, in the Albertson Case, the court said:

"The purpose and object of section 2 of article 10 of the constitution, as is very obvious, was to secure to the several recognized civil and political divisions of the state the. right of local self-government, by requiring that all county, city, town, and village officers, whose election or appointment was not provided. for by the constitution, save those whose offices might thereafter be created by law, should be elected by the electors of the respective municipalities, or appointed by such authorities thereof as the legislature should designate. As to offices known and in existence at the time of the adoption of the constitution, this provision is absolute in its prohibition of an appointment by the central government or its authority, or by anybody other than the local electors, or some local authority designated by law. Faithfully observed, and effect given to it in its spirit as well as in its letter, it effectually secures to each of the governmental divisions of the state the right of choosing or appointing its own local officers, without let or hindrance from the state government, and none can be deprived of the rights and franchises thus guarantied to all. The theory of the constitution is that the several counties, cities, towns, and villages are of right entitled to choose whom they will have to rule over them, and that this right cannot be taken from them, and the electors and inhabitants disfranchised, by any act of the legislature, or of any or all the departments of the state government combined. This right of self-government lies at the foundation of our institutions, and cannot be disturbed or interfered with, even in respect to the smallest of the divisions into which the state is divided for governmental purposes, without weakening the entire foundation; and hence it is a right not only to be carefully guarded by every department of the government, but every infraction or evasion of it to be promptly met and condemned, especially by the courts, when such acts become the subject of judicial investigation." People v. Albertson, 55 N. Y. 50–56.

The subject is one of rapidly increasing importance. Already the large majority of the people of this state are residents of cities, and the trend of population is more and more to those centers of business and of people. The future success or failure of our present form of government will depend largely upon the capacity of the inhabitants of cities for self-government. If they are incompetent to manage their own home affairs, how can they be expected to be fitted to properly determine those of the state or nation? To obtain and maintain fitness and capacity for self-government, it is important that the training schools of local self-government should be maintained in all their force and vigor. Any departure from the principles of local

self-government for the purpose of remedying temporary real or fancied grievances or evils is both a confession of incapacity on the part of the people to govern themselves, and a means of creating such incapacity, and is sure, sooner or later, to cause greater evils than those sought to be remedied by such departure. In ceasing to exercise power, the capacity to do so is impaired, if not destroyed.

The evident and avowed purpose of the act under consideration is to divide the board of police commissioners equally between the two leading political parties. It absolutely prevents the majority from controlling that department. As stated by me in the beginning of this discussion, if it can be done in this department, it can be done in every department of municipal government. It strikes at the very foundation of our government. It proceeds upon the theory that the majority are unfit to govern. It absolutely destroys local self-government. It prevents the majority of the people of a locality from managing their own local affairs, and from selecting their own local officers. It gives the minority the same power as the majority. To enable the people to control under this act, there must be practically a municipal revolution. The common council or board of aldermen of the city of Albany consists of 19 members. Laws 1895, c. 863, § 2. If the majority of the people become dissatisfied with the management of the police commissioners, and desire to place it under different management, they must be able to elect 14 out of the 19 aldermen. Otherwise, no matter how large their majority in the city may be, if they only elect 13 aldermen, they can only elect 2 of the commissioners. The small minority elect the other 2, and thus their efforts to control their own local department of government, to stop maladministration or worse, are absolutely nullified.

What I have thus far said is not necessarily in conflict with the principle of minority representation. Minority representation, and placing the minority upon an exact equality with the majority, are vastly different things. The principle of minority representation recognizes the right of the majority to a preponderance. In representative bodies it seeks representation by parties in proportion to their respective numbers, but not equality of representation. In administrative bodies it simply seeks to have the minority placed in a position where it can watch, obtain knowledge of what is being done, see that the majority acts honestly and according to law, protest against bad government or corruption, and disclose the acts of the majority to the public,—the only proper functions of a minority. None of the cases to which my attention has been called, or which I have been able to find, are inconsistent with the views herein expressed. The case of Patterson v. Barlow, 60 Pa. St. 54, is one where the constitutionality of a law providing for the registration of citizens and for the conducting of elections was attacked. The only provision of that law which is at all pertinent to this case is that which provided for the appointment of election officers. Such appointments were to be made by the board of aldermen, and the law provided for the appointment of a judge and two classes of inspectors,—the judge and one inspector of each class to be elect-

ed by the majority party, and one of each class to be taken from the party having the next highest number of votes. The board of aldermen were to appoint the persons so designated by the electors. As was stated in the opinion: ·

"The law binds the board of aldermen to appoint the officers of election, so that the political party having a majority of the election divisions shall have a majority of the board. It requires the canvassers to be appointed, so that each party will be represented in the several boards of canvassers, adding a supervisory power in the courts to correct errors. What fair mind can pronounce this an abuse of legislative power so gross, so palpable, and so plain as to become an unconstitutional act?"

In the case of People v. Hoffman, 116 Ill. 587, 5 N. E. 596, and 8 N. E. 788, the constitutionality of a law came in question, which provided for the appointment by the county court of three election commissioners, and provided that "two of such commissioners at least shall always be selected from the two leading political parties, one from each of said parties."

In the case of Rogers v. Common Council of Buffalo, 123 N. Y. 173, 25 N. E. 274, the question under discussion was not considered by the court. The law under consideration there simply provided for minority representation, not for equality of representation with the majority.

In re Manning, 71 Hun, 236, 24 N. Y. Supp. 1039, arose under a statute which was designed to secure minority representation in the election boards of the different election districts in the city of Albany. The purpose was to give the majority two of the three inspectors of election in the election districts where they were in the majority, and the minority party one. To carry that purpose into effect a board of election commissioners was provided for, not more than two of whom were to be of the same political faith, who were to appoint the inspectors of election. The law then provided that the inspectors of election of the same political faith as the minority member of said board should be selected solely by him. It will thus be seen that the right of the majority to the preponderance was recognized. The question of the constitutionality of the law was not raised in that case. It was argued and decided without reference to that question.

None of these cases or the laws considered in them present the features presented in this act. In all of them the minority were simply given representation. In none of them were they placed upon an equality with the majority, or the majority deprived of their rightful preponderance. In City of Evansville v. State, 118 Ind. 427, 21 N. E. 267, a law for a board of metropolitan police and fire departments in all cities of a certain class, and providing that the officers and patrolmen of such fire and police departments should be selected equally from the two leading political parties of each city, was held to be in violation of the constitution. In the case of Attorney General v. Detroit Common Council, 58 Mich. 213, 24 N. W. 887, a law which provided for the appointment of a board of commissioners by the mayor of the city, which board should be equally divided between the two principal political par-

ties, who should appoint inspectors, to be likewise equally divided between the two principal parties, was held to be unconstitutional.

The question has on several occasions been brought before the courts of this state, but never passed upon by them, for the reason that they would not pass upon a constitutional question unless necessary for the decision of the case. In People v. Crissey, 91 N. Y. 616, it was held that the designation of the common council as the authority to appoint police commissioners was to that extent a lawful enactment, but upon that portion which confined the vote of each alderman to one out of the two to be chosen, thus making it possible for less than a majority of the quorum to elect one of the commissioners, the court did not pass, because it thought that the case could be decided without doing so. But it is evident, from a careful reading of the opinion, that the belief of the court was that such direction by the legislation as to the method in which the common council should exercise its authority was in conflict with the constitution, and therefore not binding upon the common council, and that it was to be presumed that the common council, in making their choice, had done so knowing that such provision was not binding upon them, and had not followed its provisions,—the court saying:

"But if we assume this provision to be unconstitutional, it was a nullity. We are not at liberty to say that the common council did not know it. They are presumed to have known the law, and had an official legal adviser entirely competent for their instruction. They must be held, then, to have voted without restraint. We cannot say that an unconstitutional law, if, indeed, it be such, put them under compulsion. A nullity, known to be such, cannot compel. The aldermen chose to vote, therefore, as they did vote."

There are other cases in this state where similar questions were brought up, but which the court refused to pass upon for substantially the same reasons given in the Crissey Case, some of which cases I will hereafter refer to in another connection. No presumption that the common council will ignore the unconstitutional provisions of this act can be indulged in. Williams v. Boynton, 147 N. Y. 426, 42 N. E. 184. In addition, any such presumption is absolutely negatived in this case.

The plaintiffs, in their complaint, among other things, allege:

"Sixth. That the defendant John F. Donovan is the president of said common council, and that these plaintiffs are informed and believe, that, unless restrained by the order or judgment of this court, the said Donovan or some other of the defendants who are members of said common council, acting as president or chairman of said common council, will declare persons to have been elected or appointed as police commissioners who have not received the votes of a majority of the members of the common council, or of a quorum thereof.

"Seventh. Plaintiffs further charge, upon information and belief, that the defendants herein, who are members of the common council of the city of Albany as above stated, or some of them, intend and threaten, and are about, unless restrained by the order or judgment of this court, to proceed under the said act, and, without reference to any nomination to be made by the mayor of said city, to vote for police commissioners, or for two persons as police commissioners, and that the persons who may be elected or appointed, or who may claim to be elected or appointed, as police commissioners, under the provisions of said act, will claim to constitute the board of police commissioners of the city of Albany."

The defendants, by their pleadings, either admit or affirmatively assert that they are going to do the things that, in the Crissey Case, it was presumed they would not do or had not done. There are two answers to the complaint,—one in behalf of 9 of the defendants, 8 of whom are members of the common council. As to the sixth clause or count above set forth, they deny any knowledge or information sufficient to form a belief as to any of its allegations. As to the seventh count or clause, they are silent, and therefore must be held to admit its allegations. They also affirmatively assert the constitutionality of the act. And their legal adviser, who appears for them here, we must assume to be entirely sincere in his contention that the act in question is a valid one, and that he has so advised his clients, and will continue to so advise them, and that they will be guided by his advice. The other answer is made by 15 defendants, 11 of whom are members of the common council; and their answer does not deny any of the allegations of the complaint, but affirmatively asserts that they intend, unless restrained by the order of the court, to perform the duties devolved upon them by the act in question. So that this case presents a different state of facts, and one from which entirely different inferences should be drawn, than those in the Crissey Case, and renders that, if anything, an authority for the contention of the respondents.

What I have here said will also serve as an answer to the objection that the action is prematurely brought.

It is contended, however, that a practical construction has been given to the power of the legislature to enact a law of this kind by repeated acts of the legislature; and a long list of statutes is set forth in the appellants' brief, claimed to be similar to the act in question here. Time will not permit a review of the provisions of each, nor is it necessary. Some of them provide simply for minority representation, a subject which is not under discussion here. A few of them provide for an equality of representation between the leading political parties, but none of them present all the objectionable features present in the act under consideration, and most of them have been enacted in the last few years. So far as I can discover, there is only one that presents exactly the same questions as are here presented, and that act was passed at the same session of the legislature as the one now before us. Upon these acts, however, the appellants make the point I have suggested. I quote from the very excellent brief of the appellants' counsel:

"The practical construction of the constitution, given by the legislature, and acquiesced in and acted upon by the executive and administrative departments of the government, accords with the appellants' contention. It has been held to be the law for many years that legislative interpretation of the constitution, and the practical construction given to a doubtful statute by the public officers of the state, and acted upon by the people thereof, is decisive, in case of doubt. People v. Dayton, 55 N. Y. 367–377; People v. Insurance Co., 92 N. Y. 337. In People v. Dayton, at page 377, Andrews, J., says: 'The practical construction of the clause in question by the legislature, commencing with the adoption of the amendment of 1853, and continued to the present time, which has been acquiesced in and acted upon by the executive and administrative departments of the government, and

which, so far as we know, has never before been questioned, is entitled to great, and we think controlling, weight in its interpretation. It has almost the force of a judicial exposition (Story, Const. § 408); and, unless such legislation and practice is manifestly in violation of the words used, the greatest weight should be given to it in construing them (Cooley, Const. Lim. 67, and cases cited).' "

Then follows the list of statutes I have referred to.

The last expression of the court of appeals upon the subject of legislative construction is found in the opinion of Chief Justice Andrews in the case of People v. Murray, 149 N. Y. 367, 44 N. E. 146. One of the questions in that case was as to whether the legislature could, by an act passed by less than two-thirds of its members, appropriate any part of the revenues raised under a general law of the state to any other than state uses. In his opinion the chief justice says that the provisions of the present constitution under which the contention is made. has formed a part of the organic law of the state ever since the constitution of 1821, and that while, undoubtedly, it would have been competent for the legislature from the first to have directed all the moneys derived from excise fees or licenses to be paid into the state treasury for general purposes, yet the uniform course of legislation has been to permit the localities where the licenses were granted to retain such license fees and use them for local purposes; and he proceeds to say:

"Seventy-five years have elapsed since the constitutional provision now in question first became part of the organic law, and during that long period this practice, under statutes which concededly were enacted without a two-thirds vote, has prevailed, and has never hitherto been challenged as a violation of the constitution. * * * This legislative policy which has prevailed for so long a period. sanctioned by numerous statutes, and never questioned in the courts, and acquiesced in by all departments of the state government, is the practical construction of the constitutional provision now in question, that an appropriation of excise moneys to the use of towns and cities under acts passed by a majority vote is not an infraction of the constitution, and this construction ought not now to be disturbed."

It will be observed, in these cases, that stress is laid upon the fact that the legislation has been uniform in its character, has long been acquiesced in, and has never been questioned in the courts. It cannot be availed of when the legislation has not been uniform, not acquiesced in, and has been repeatedly questioned in the courts. This construction has, as a rule, been applied only to what may be termed "administrative statutes"; that is, statutes relating more particularly to the transaction or regulation of governmental business. It can hardly be said to be strictly a rule of construction, but rather a persuasive aid to the court in determining what the true interpretation is; something to assist the court in arriving at the correct interpretation or meaning of the law in otherwise doubtful cases,—not a rule to control, but to advise the court. This aid to interpretation cannot be availed of in this case, for the reasons that legislation upon the questions involved has not been uniform; the statutes cited being exceptions to the general rule of legislation. Again, the principle of legislation here contended for has never been acquiesced in, but has al-

ways been questioned and doubted, and has frequently been brought into question in the courts of the state, and an adjudication upon it sought.

The principle of minority representation has long been a mooted question in this state, and doubts have always been expressed as to whether it was feasible under the constitution. In 1875 a commission was appointed to devise a plan for the government of cities in the state of New York. It was composed of some of the most eminent lawyers and publicists in this state, a number of whom are still living. They believed it desirable to have some scheme by which the minority might be represented in city boards. They discovered the constitutional objections. In order that the merits of the principle might be tested, they recommended the adoption of a concurrent resolution for the submission to the people of a proposition, to amend the first section of the second article of the constitution, by inserting therein the following words:

"But the legislature may provide that elections for members of city boards shall be so regulated as to give minorities a proportionate share of representation therein."

See Assembly Documents, No. 68, p. 47, for the year 1877.

The proposed amendment was never adopted.

The principle that the commission wished to test was that of minority representation merely,—a principle far less repugnant to the constitution than that of minority equality. The objection to it under the constitution was that the people,—that is, the majority,— would not be able to select all their own local officers. They could select a majority, but not all. Here the proposition is that the minority shall have equal representation with the majority. It proposes to prevent the majority from having a "proportionate share of representation" in the municipal boards. It is the very reverse of proportionate representation of the minority.

The movement for minority representation did not end with the defeat of this proposition of the commission. It continued to be the subject of discussion by those interested in the problems of municipal government until the convention which framed our present constitution was held, when much consideration was given to the subject. Propositions were made to embody in the constitution sections which would enable the legislature to so arrange the charters of cities as to provide for the representation of minorities. After a somewhat prolonged discussion, these propositions were all defeated. Debates of Const. Conv. 1894, pp. 1580–1621.

I have also before me the published opinions of some of the most eminent constitutional lawyers of the bar of New York City, given in the year 1895, holding unconstitutional a bill then pending before the legislature of the state, which read in part as follows:

"After the 1st day of November, 1897, there shall be elected in the city of New York two police commissioners of said ci y, who shall hold their respective offices for a term of six years from the first day of January succeeding their election, and until their successors are duly elected and shall have qualified. The mayor of New York shall immediately after the votes are canvassed, appoint by writing two additional police commissioners of said

city, to be associated with the two commissioners who shall have been elected, and which commissioners so to be appointed, shall be those two persons who shall have received the highest number of votes next to the two persons who shall have been elected police commissioners of said city. No ballot shall be counted upon which more than two names for police commissioners of said city shall appear."

The act never became a law.

These illustrations are given to indicate that the principle contended for by the appellants has not been acquiesced in. Others might be given, but these are sufficient.

The question has been brought before the courts in a number of cases, but not decided, because the court in each instance saw its way clear to decide the case without passing upon the constitutionality of the act. I have already, in another connection, referred to the case of People v. Crissey, 91 N. Y. 616, and the reasons given for not deciding it there. In the case of People v. Perley, 80 N. Y. 624, it was attempted to bring in question the constitutionality of an act which provided for the election of aldermen in the city of New York by districts, three in each district, and which provided that no voter should vote for more than two aldermen. The election was held. The relators, three in number, ran upon the same ticket, while the defendants, who received a much larger number of votes than the relators, ran upon ballots containing but two names for the office of aldermen. The court refused to pass upon the constitutionality of the act, and held that the action could not be maintained for the reason "that, if the voters might have voted for three, and by voting for two only exercised in part their privilege or duty of voting, this did not affect the legality of the votes cast; and so that the question of the constitutionality of the act was not presented." In the case of People v. Kenney, 96 N. Y. 294, the act in question there provided for the election of three aldermen from senatorial districts, and six from the city at large. The voters were limited to voting for not more than two of the aldermen to be chosen in the senatorial districts, and for not more than four of the six aldermen to be elected from the city at large. The court said:

"The constitutional question which the plaintiffs sought to raise by the commencement of this action is a very grave and interesting one, and should not be decided in any case unless it is properly presented and necessarily involved. It need not be decided in this case. * * * It does not appear that any voter claimed the right to vote for all the six aldermen and was denied that right. If he chose voluntarily to waive his constitutional right to vote for six, and to vote for but four, that he could do, and his ballot would be a valid ballot. So, in the senatorial districts, it does not appear that any voter was denied the right to vote for the three aldermen; and, if the voter chose to vote for but two, his ballot would be legal, and no one could complain. If a voter had offered to vote for the six aldermen at large, or for the three aldermen of a senatorial district, and had been refused, he could, by mandamus, or by some other form of action, have presented to the courts the question of his constitutional right to vote for as many candidates as there were aldermen to be elected. * * * There are ways enough in which to test the constitutionality of those restrictions, but they are not involved in this case."

See, also, Demarest v. Wickham, 63 N. Y. 320, and Demarest v. City of New York, 147 N. Y. 203, 41 N. E. 405.

It will thus be observed that the essential elements for rendering prior legislation an aid to construction are lacking in this case. The principle of the act has not been long acquiesced in, and, while there has never been such an act passed before, yet other ones, possessing some of its features in principle, have been repeatedly questioned, and attempts made to have the courts pass upon their constitutionality.

The legislative opinion upon a question of law, as evidenced by the passage of bills, has been held to be of very little weight. In the case of Eels v. Telegraph Co., 143 N. Y. 133, 38 N. E. 202, it was held that the passage of an act authorizing the use of highways by telegraph companies, and long acquiescence in such use under the act by adjoining owners, was of no weight in construing the law; the court saying:

"The question is one plainly of law, and, whatever may have hitherto been the legislative belief or the opinion of the adjoining owners as to the propriety of this use of a rural public highway, it must be decided by us in accordance with our own view as to what the law is upon this subject."

And again:

"The argument founded upon the legislative belief of the legality of such use has also very little weight."

The act in question, and the use of highways under it, had been in operation over 40 years.

So in this case so-called "legislative construction" cannot either trammel us or aid us. It is a question of law, which "must be decided by us in accordance with our own views as to what the law is." Without further continuing this branch of the discussion, suffice it to say that, in my opinion, the purpose of the bill is obnoxious to the constitution as an infringement upon the right of the majority to select their own officers, either immediately by election or by their accredited agents, and as destructive of the principle of local self-government.

What I have said as to the unconstitutionality of the purpose of this act, to divide the board of police commissioners equally between the two principal parties, is not necessarily in conflict with the power of the legislature to create state boards to discharge ministerial and administrative functions, and provide for the selection of the members of such boards from the different parties, as has been done in the case of the railroad commissioners and the board of mediation and arbitration. The principle that the majority of the people of a locality shall have the power to govern themselves in local matters, and select their own local officers, can go hand in hand with the power of the majority of the people of the whole state to make the general laws, and to elect or provide for the selection of the state officers. It may well be that, in the creation of agencies to discharge ministerial and administrative functions for the whole state, the legislature has unrestricted power. Such action is not necessarily repugnant to the principle that the majority shall rule, for the majority is presumably represented by the legislature; and such laws are not local, but for the whole state, and are not in conflict with any principle like that of local self-government, or with any specific

article of the constitution; while the act we are now considering is in conflict, not only with a principle underlying and imbedded in the constitution, but also with, at least, one specific article thereof.

2. The means by which it is sought to accomplish the purpose of the section under consideration are repugnant to the constitution. Let us recur to those provisions of the section providing for the selection of commissioners:

"On the first Monday after the passage of this act, the common council shall meet at eight o'clock in the evening in the common council chamber and shall proceed to elect four persons, residents and freeholders in the city, as such police commissioners, and for the purpose of such meeting the members attending shall constitute a quorum. Each member of the common council shall be entitled to vote for not more than two of such persons, and the four persons receiving the highest number of votes shall be such police commissioners. * * * If a vacancy shall occur in said board of police commissioners otherwise than by expiration of term, it shall be filled by appointment by the mayor upon the written recommendation of a majority of the members of the common council belonging to the same political party or organization as the police commissioner whose office shall become vacant. No person is eligible to the office of police commissioner unless at the time of his election he is a member of the political party or organization having the highest or the next highest representation in the common council."

Section 2 of article 10 of the constitution reads as follows:

"All county officers whose election or appointment is not provided for by this constitution, shall be elected by the electors of the respective counties or appointed by the boards of supervisors, or other county authorities, as the legislature shall direct. All city, town and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof, as the legislature shall designate for that purpose. All other officers, whose election or appointment is not provided for by this constitution, and all officers whose offices may hereafter be created by law, shall be elected by the people, or appointed, as the legislature may direct."

As before stated:

"The obvious purpose of the provision of the constitution which has been quoted was to secure to the people of the cities, towns, or villages of the state the right to have their local offices administered by officers selected by themselves." People v. McKinney, supra.

To secure that, they must be either elected by the people or appointed by those upon whom the people have conferred power and authority by election. That power or authority is never more than one remove from the people; that is, an appointee vested with governmental power or authority cannot be appointed by an appointee. The one who has power or authority conferred upon him may appoint subordinates to assist him in exercising the power conferred upon him, but cannot, by appointment, confer any of the power of the people upon anyone else. That has, as a rule, been reserved to those officers whom the people have directly chosen, and who are directly responsible to them. The cases where this rule has been departed from in this state are so few as to prove the rule rather than that it does not exist. This is recognized by the term used in the section of the constitution under consideration: Local officers "shall be elected by the electors," etc., "or appointed by such authorities thereof," etc. That means those

upon whom the people have conferred authority, not their agents' agents. "The words employed in the constitution are to be taken in their natural and popular sense, unless they are terms of art, in which case they are to be taken in their technical signification." Black, Const. Law, 66. "An authority means a person or persons or a body, exercising power or command." Imperial Dict.; Cent. Dict. "The body or persons exercising power or command." Murray's Eng. Dict.

In this state there are, in the cities, two kinds of power or au-, thority, the executive and legislative. The legislative power is vested in the common councils or boards of aldermen of the cities. This is so in the city of Albany. Its charter (chapter 298, tit. 3, § 1, Laws 1883) reads as follows: "The legislative power of the said corporation shall be vested in a board of aldermen, who shall form the common council of the city of Albany." "The executive power of the corporation shall be vested in the mayor." Laws 1883, c. 298, tit. 4, § 1. In considering this section, "we must keep in mind that the constitution was not framed for a people entering into a political society for the first time, but for a community al-ready organized and furnished with legal and political institutions, adapted to all or nearly all the purposes of civil governments, and that it was not intended to abolish these institutions, except so far as they were repugnant to the constitution then framed." People v. Draper, 15 N. Y. 532. "A constitution is to be held as pre-pared and adopted in reference to existing statutory laws, upon the provisions of which, in detail, it must depend to be set in practical operation." People v. Potter, 47 N. Y. 375-380. It must also be assumed that the framers of the constitution had knowledge as to what, under the then existing laws, were the local authorities, and that they used such words with reference to the then existing laws of the state. People v. Rathbone, 145 N. Y. 434-438, 40 N. E. 395. It must also be assumed that they knew the existing local offices of the state.

The present constitution was adopted in 1894. It was adopted by the convention as a whole, and was all submitted to the people. See Debates of Convention, pp. 2633-2662, 2671-2678. At the time of the adoption of the constitution the office of police commissioner was and had been in existence for many years, in the cities of the state, and was and had been for many years prior in existence in the city of Albany. Common councils were also at that time the legislative authorities of cities. Common councils and boards of aldermen of cities are constitutional bodies; that is to say, they are governmental bodies, recognized by the constitution. See Const. art. 3, §§ 26, 28; Id. art. 12, § 2. And, as referred to and recognized in the constitution, it must be assumed that they were referred to and recognized with their then existing powers and au-thority. Prior to the adoption of the present constitution, it was common law that it required a majority of any public body to ex-ercise the power and authority conferred upon it. It was, and had been for many years, the statutory law of the state that whenever power, authority, or duty was conferred upon three or more offi-

cers, that power, authority, or duty might be exercised and performed by a majority of them. 2 Rev. St. p. 555, § 27, as amended by Laws 1874, c. 321; 1 Birdseye's St. p. 27, § 87; Statutory Construction Act, Laws 1892, c. 677, § 19.

In U. S. v. Ballin, 144 U. S. 1, 12 Sup. Ct. 507, the court, in speaking of the power of legislative bodies, said:

"Power is not vested in any one individual, but in the aggregate of the members who compose the body; and its action is not the action of any separate member or number of members, but the action of the body as a whole. And the question which has over and over again been raised is, what is necessary to constitute the official action of this legislative and representative body?"

Then it proceeds to demonstrate, by reference to authorities, that it requires a "majority of such legislative body to act." So, in Ex parte Willcocks, 7 Cow. 402, it was held "that, at common law, in no case of a corporate action should less than a majority act."

In Brown v. District of Columbia, 127 U. S. 579, 8 Sup. Ct. 1314, and in Railroad Co. v. McKeen, 149 U. S. 259, 13 Sup. Ct. 840, it was held that a minority of a select body could not perform a valid act.

The charter of the city of Albany (Laws 1883, c. 298, tit. 3, §§ 1, 2, 5, 6) provides that a majority of the common council shall be necessary to do business and to constitute a quorum. The legislature having selected a local authority, we must read that authority into the constitution. In this case, having selected the common council, it is the same as if the constitution read: "Police commissioners in the city of Albany shall be appointed by the common council." That means the common council with the power and authority it had when the constitution was adopted. For that purpose the common council is a constitutional body, and the legislature has no power to change its power or authority. People v. Angle, 109 N. Y. 564, 17 N. E. 413; Menges v. City of Albany, 56 N. Y. 374; Id., 47 How. Prac. 248; Warner v. People, 2 Denio, 272; Clapp v. Ely, 27 N. J. Law, 622. The constitution having authorized the legislature to designate a local authority to appoint local officers, it must designate that local authority as it then existed, and, as we have seen, that authority was a majority of the common council. As was said in U. S. v. Ballin, supra, its power and action "is not the action of any separate member or number of members, but the action of the body as a whole." The legislature cannot vest the power of appointment in any fractional part of the local authority. As before stated, the common council of the city of Albany is composed of 19 aldermen. It follows, of course, under the provisions of this act, that two of the commissioners must necessarily be elected by a minority of the board. That is the intention of the act. Each commissioner is a city officer. Each one must, under our constitution, be either elected or appointed by some local authority. The local authority is the majority of the common council. The power and authority of the common council is not vested in any separate member or members

thereof, but in the body as a whole; and that power and authority can, under the decisions herein referred to, be exercised only by the majority.

What I have said in reference to the minority being able to elect two of the commissioners, under that provision of the law which provides that each member of the common council shall only vote for two of the four commissioners, also applies to that portion of the law which provides that, for the purposes of the meeting at which commissioners shall be elected, "the members attending shall constitute a quorum." That would enable a minority of the common council, no matter how small, to elect all four commissioners. "The constitutional validity of a law is to be tested, not by what has been done under it, but by what may, by its authority, be done." Stuart v. Palmer, 74 N. Y. 183; Coxe v. State, 144 N. Y. 396–408, 39 N. E. 400; Gilman v. Tucker, 128 N. Y. 190–200, 28 N. E. 1040. At the time of the adoption of the constitution a minority of the common council was not a local authority, and the legislature has no power to create the minority an authority. Whatever power it may possess, in granting charters to business corporations, to make less than a majority of the trustees a quorum to transact business, I do not think that it possesses that power when it is providing for the organization of elective bodies in political subdivisions of the state; but, be that as it may, under the authorities I have cited, this authority being vested in the majority at the time the constitution was adopted, it cannot confer it upon a lesser number. Both the officers here in question and the local authority mentioned in the act were in existence when the constitution was adopted. The legislature has not by this act created a new office, and it cannot create a new local authority competent to appoint local officers.

It was suggested, upon the argument, that the individual members of the common council are local authorities. If that were so, it would be of no consequence, because the power attempted to be conferred by this act is upon the common council, not upon the aldermen who compose that body. It says: "The common council shall meet * * * and shall proceed to elect," etc. Then follows the manner in which it shall elect. Then, again, it provides that, every two years, "the common council shall meet and proceed in like manner to elect four police commissioners." All through it speaks of the common council, and it is evident that it was intended to recognize the common council as the local authority to make the appointments. But, if it were not so, and we were to consider the act as conferring the power of appointment upon the aldermen separately, instead of collectively as a common council, then the act would be indefensible, because aldermen in the city of Albany have absolutely no power, authority, duty, or function to exercise or perform, except collectively as a common council.

It is not a question as to what powers aldermen formerly possessed, or what aldermen in other cities possess, but whether aldermen of the city of Albany, at the time this act was passed, possessed any powers or authority, as individuals, which makes them individually and separately local authorities, within the meaning

of the constitution. The charter of the city of Albany, both at the time of the adoption of the constitution and of the passage of this act, was chapter 298 of the Laws of 1883, with various subsequent amendments; and a careful examination of such charter, coupled with a previous familiarity with its provisions, shows that aldermen, as such, have absolutely no power or authority. Many years ago, under prior laws, they had some powers and duties to perform, as fence viewers, commissioners of highways, and some of the functions of magistrates, but those have all been taken away. The common council, and not the aldermen as such, is now the commissioner of highways, and acts as such as a body (section 14, tit. 3, c. 298, Laws 1883); and the city engineer and surveyor and his deputy are the fence viewers (section 8, tit. 13, Id.); and the powers of magistrates are exclusively vested in the different local courts and the magistrates thereof. But, to use the language of one of my associates, which I am permitted to quote:

"Conceding that each alderman is a city authority, what alderman is designated by the provisions of this act as the appointing authority? No particular alderman, or set of aldermen, is specified, nor is the whole body of aldermen designated as the authority. If we suppose that such of the aldermen as shall assemble upon the day specified, pursuant to the requirement of the act, are the authorities intended, yet such number are not permitted to appoint the whole four commissioners. No one of them can have a voice in selecting more than two. It is only groups or parts of such members that can select any commissioner, and, in fact, the authorities making the appointments are not known until after the appointments are made. Even if we should concede that certain specified aldermen might be designated to appoint two of the commissioners, and certain other aldermen designated to appoint the other two, yet no such designation has been made. A certain procedure is provided by which the aldermen assembled may break their number up into groups, and by which such groups may appoint one or two of the commissioners. But what authority it is that appoints any one of the commissioners named is neither known nor designated until after the appointment. Moreover, an alderman, under the charter of the city of Albany, is not a city authority. Possibly he may be a city officer, but he is an officer without any authority whatever to act for the city, or in any city matter, except as a member of the common council. Collectively, as composing the council, they have great authority. Individually, as an alderman merely, or a number of them together constituting a group of aldermen, no authority whatever is vested in them. With this fact before me, I can have no doubt but that the legislature intended to designate the common council, and not the aldermen, as the appointing authority. The act never was intended to confer authority upon any alderman to make the appointments. The purpose was to have the common council make them, but the procedure required from that body utterly deprives it of the power of appointment."

The provision of the section as to filling vacancies is equally repugnant to the constitution. It is as follows:

"If a vacancy shall occur in said board of police commissioners, otherwise than by expiration of term, it shall be filled by appointment by the mayor upon the written recommendation of a majority of the members of the common council belonging to the same political party or organization as the police commissioner whose office shall become vacant."

If this is to be construed as in effect giving the power of appointment in whole or in part to the members of the common council, it should need no argument to show that no party or political

organization, or the members thereof, or aldermen or city officers belonging to a specified party, are local authorities, within the meaning of the constitution. I presume, however, that it is intended to confer the power of appointment upon the mayor as a local authority. Then it is void as being a limitation upon his authority, under the principle decided in People v. Angle and Menges v. City of Albany, supra. The legislature exhausts its power when it designates the local authority. It cannot limit or restrict that authority, or annex conditions to its exercise of the power conferred. I am of the opinion, therefore, that the legislature had no power to confer the power of appointment of police commissioners upon less than a majority of the common council; that it could not make less than a majority a quorum for the purpose of making such appointments; that it could not confer the power of appointment upon "any separate member or number of members," but only upon that body as a whole; and that it had not power to confer the authority to appoint upon the individual aldermen composing the common council; and that it had no power to confer the power of filling vacancies in the board upon the majority of the representatives of any political party or organization in the common council, or to limit and restrict the power of the mayor to make such appointment to the persons recommended to him by a majority of the representatives of any political party or organization in the common council.

I am thus brought to the consideration of that clause of the section by which it is proposed to insure beyond question the equal division of the commission between the two principal parties, and to exclude members from any other party. That clause is as follows:

"No person is eligible to the office of police commissioner, unless at the time of his election he is a member of the political party or organization having the highest or the next highest representation in the common council."

The learned justice at special term has discussed this question so thoroughly and satisfactorily that there is no need of any lengthy discussion here. I may add, however, that while, perhaps, this requirement is not in express conflict with section 1 of article 13 of the constitution, which provides that "no other oath, declaration or test shall be required as a qualification for any office of public trust" than the oath or affirmation set forth in that section, yet it is in direct hostility to its spirit. In the case of Rogers v. Common Council of Buffalo, 123 N. Y. 173, 25 N. E. 274, the court said:

"Most, if not all, of the provisions of the federal and state constitutions, which are of the nature of a bill of rights, were placed therein with reference to English history, and the struggles for liberty which such history recorded. Declarations, oaths, and tests as a condition for holding office had been frequently resorted to by the parliament of Great Britain for the purpose of promoting the prosperity of one religion or insuring the downfall of another." Page 189, 123 N. Y., and page 278, 25 N. E.

The court then proceeds to give a brief history of the English test oaths, and holds that the intention of the framers of our constitution was to prohibit the requirement of any test of a like nature in this country.

In addition to what · was there said, and also in the cases of Counselman v. Hitchcock, 142 U. S. 547, 12 Sup. Ct. 195, and People v. Palen, 74 Hun, 289, 26 N. Y. Supp. 225, it may also be said that, at the period of English history referred to, religion was inextricably mingled with the politics of the day, and that test oaths were imposed fully as much "for the purpose of promoting the prosperity of one" political party, "or insuring the downfall of another," as they were for the purpose of insuring the prosperity or downfall of any religious denomination. As a rule, where a religious adversary was excluded from office by means of the test oaths, a political adversary was likewise excluded. The intent and effect of the test oaths was to exclude from offices of trust and power those of contrary opinions to those in power upon the great questions then dividing the English people. It was part of the system of exclusion from equal rights and privileges, and of "persecution for opinion's sake," that characterized the long politico-religious struggle between the two leading faiths and parties that shook England and a large portion of Europe for so many years; and, in prohibiting similar tests in this country, it was also the intention to prohibit in any manner the accomplishment of the purpose for which those tests were · intended,—that is, the exclusion of men from the enjoyment of equal rights and privileges with their fellow men, and from holding positions of power and public trust, because of their opinions. In excluding the thing, they also excluded the spirit that animated it, and it is now the law of this land that no man can "for opinion's sake" be excluded from any political office, or prevented from enjoying any of the rights, privileges, or immunities that any other citizen is permitted to exercise or enjoy.

There are a number of other interesting questions presented by this act, but if I am correct in my reasoning upon the questions already considered, there is no occasion to indulge in any further discussion. For the reasons, then, herein set forth, I am of the opinion that section 1 of chapter 427 of the Laws of 1896 is in all things null and void, as repugnant to the constitution. The section cannot be held good in part and void in part. The vices referred to permeate the whole section. The elimination of the particular clauses I have discussed from the section destroys the evident purpose and intent of the entire act, and to say that the remaining fragments of the act are not repugnant to the constitution, and can therefore stand, would be a mockery of the legislative will and intent. That part of the law providing for the election of police commissioners being held invalid, it follows that the judgment of the court below should be affirmed.

PARKER, P. J., and MERWIN, J., concurred on the ground that the act is in violation of section 2, art. 10, of the constitution.

PUTNAM, J., concurred in the result.

LANDON, J. (dissenting). The authority for the legislation that is challenged by this action, if it exists, must be found (1) in the

plenary power of the legislature over legislative subjects, except as restrained either by the state or the federal constitution; (2) in the express grant of power contained in section 2, art. 10, of the state constitution, hereinafter quoted. If the plenary power of the legislature over the subject is so restrained by any constitutional provision, other than the section cited, as to withold the power to pass the statute here under review, then the sole authority for the power must be found in that section. If it is not so restrained, then that plenary power, and the section quoted, both concur in justifying the legislation.

1. As to the plenary power of the legislature: It is nowhere declared in the state constitution that every qualified elector is eligible to office, whether elective or appointive. It is declared (art. 1, § 1) that "no member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers." It is not claimed that the act disfranchises any one, but it is claimed that it deprives certain members of the state of "the rights and privileges secured to any citizen thereof," in that it deprives them of eligibility to the office of police commissioner. Clearly, no citizen of the state has the right or privilege of holding an office until he has secured title to it. Equally clear is the proposition that no person is eligible to any office unless he possesses the essentials of eligibility, and he must possess them before he can be deprived of them. It may be conceded that it is a fair deduction from various provisions of the constitution that every citizen who is qualified to vote "for all officers that now are or hereafter may be elective by the people" (article 2, § 1), in the absence of further constitutional or competent statutory requirements of eligibility, is eligible to all such elective offices, and also to all appointive offices. If, however, a person possesses neither the constitutional nor the competent statutory requirements of eligibility, he is not deprived of eligibility; he simply has failed to attain to it. Public offices are not instituted for the benefit of the officeholder, but for the benefit of the state. It follows from this trite proposition that the fitness of a candidate for office is a matter of paramount public concern. In the majority of cases the question of fitness is committed to the care of the electoral or appointing body, but in a few of the more important cases the constitution declares certain persons to be ineligible to certain offices. Thus, "No member of the legislature shall receive any civil appointment within this state." Article 3, § 7. "No person shall be eligible to the legislature who at the time of his election is, or within one hundred days previous thereto has been a member of congress, a civil or military officer of the United States or an officer under any city government." Section 8. Sheriffs "shall be ineligible for the next term after the termination of their offices." Article 10, § 1. Certain requisites of eligibility to the office of governor are prescribed (article 4, § 2), and of the state engineer and surveyor (article 5, § 1). These instances are enough to show that the essential of fitness is in some cases so important as to be worthy of constitutional safeguards. The fact that in a few cases the constitution expressly

prescribes certain requisites does not withdraw all other cases from the legislative jurisdiction, because all legislative power not expressly withheld or denied is vested in the senate and assembly. Therefore the legislature may, in proper cases, prescribe the requisites of eligibility, or deny eligibility, and it has done so in numerous cases. A conspicuous instance is found in the civil service statutes, and the regulations they authorize. Rogers v. Common Council, 123 N. Y. 173, 25 N. E. 274. Residence in the locality where the officer is to serve is sometimes prescribed. People v. Platt, 117 N. Y. 159, 22 N. E. 937. An office requiring technical skill should not be open to those who have none. That such essentials to fitness may be prescribed by the legislature is conceded by counsel upon both sides. A supervisor is ineligible to the office of county superintendent of the poor. People v. Clute, 50 N. Y. 451. This very act requires that the persons to be appointed police commissioners shall be freeholders. Counsel urge no objection to that provision, but, conceding the validity of the provision, concede the matter to be the subject of legislative power. But it is urged that the constitution (article 13, § 1), which, after prescribing the oath of office, declares that "no other oath, declaration or test shall be required as a qualification for any office of public trust," imposes a restraint which nullifies the following provision of the act: "No person is eligible to the office of police commissioner unless at the time of his election he is a member of the political party or organization having the highest or next highest representation in the common council." If, by any fair construction of the clause, or of the act of which it is a part, it could be made to appear that its purpose or necessary effect is to proscribe any one on account of his political opinions, the provision could not be upheld. It is urged that the persons who are declared ineligible are effectually proscribed, whether such was or was not the intention, but with like effect the limitation of the eligible to freeholders proscribes the nonfreeholders; to residents, the nonresident; to a physician, all who are not physicians; and so on. Certain officers are required to give bonds, under penalty of forfeiting their offices. Is the poor man who cannot give a bond thereby proscribed? No one will so contend. Every one can see that the real purpose is to secure competent and faithful service.

It is obvious that the intention of this act is to improve the police system of the city of Albany by removing it, so far as is practicable, from the distracting influences of rival partisanship in politics, and lifting it above them. The method of making it nonpartisan is by means of bipartisan sources of appointment or election,—a method which we need neither approve nor disapprove. We need only recognize it as a legitimate subject of governmental consideration, and therefore within the legislative power. To counterpoise one partisan police commissioner by another of opposite partisan proclivities may be the best practicable method of neutralizing the evils of unilateral partisanship. If so, it must be conceded that the act under consideration seems to be apt for the purpose. It is obvious that one essential of fitness for membership of such a board is party affiliation with one or the other of the rival political parties. But it

is found by the trial court that there are several political parties. We assume that there are many competent men so select and peculiar in their views that they have no political associations. The legislature had to deal with existing conditions, and it is obvious that, to secure bipartisan commissioners, a triple or quadruple or multipartisan board could not be permitted. The policy they adopted required either a limit of inclusion, or a rule of exclusion; and it seems to me idle to say that the limit of inclusion is permissible, but the rule of exclusion is not, when both come to the same result, notwithstanding the fact that there seems to be respectable authority for this verbal but unsubstantial distinction. The purpose of the act not being to proscribe or favor any one for opinion's sake, but simply to prescribe suitable methods to secure the realization of a legitimate scheme of police government, I do not think the ineligibility clause of the act violates the constitution. It is easy to imagine absurd cases, and counsel for the plaintiffs ask, what would be thought of a provision declaring none but farmers to be eligible to the office of governor? In such cases the intent to favor one class and proscribe all others would be apparent at sight. When the letter of the constitution confuses us, we should seek the light of its spirit.

But, if we should be mistaken in this view, it will be observed that the ineligibility clause is an unnecessary one for the purpose of the act. If it had been omitted, the same result would probably, and almost inevitably, follow from the first clause of section 3, as amended, namely, "The police board of the city of Albany shall consist of four police commissioners, not more than two of whom shall belong to the same political party or organization." In view of Rogers v. Common Council, supra, it is not claimed that this provision is unconstitutional. The ineligibility clause does not require any member of the common council to vote for a commissioner of his own party faith, nor does any other part of the act. The scheme rests in part upon the usual habit of partisans. If this clause should be stricken out, the real danger of wrecking the scheme would not be sensibly increased. If, therefore, we should conclude to declare the ineligibility clause unconstitutional, the remainder of the act should stand.

2. The effect of section 2, art. 10, of the constitution may now be considered. The section provides that:

"All city, town and village officers whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof, as the legislature shall designate for that purpose. All other officers whose election or appointment is not provided for by this constitution and all officers whose offices may hereafter be created by law, shall be elected by the people, or appointed as the legislature may direct."

The city charter confers authority upon the common council as a body, and it also confers authority upon every member of it. Whether the authority conferred upon each member is only so much as enables him to act as a member of the body, or whether he has additional authority in his several capacity, is immaterial. In either event he has some authority, and is therefore included within the term "authorities," as used in the constitution. He therefore

is of or among the "authorities" whom the legislature may designate for the purpose of appointing police commissioners. The legislature, in designating the "authorities" to make the appointments in question, conferred upon them a power which they did not possess before; and as the constitution does not prescribe the manner in which this new power shall be exercised by the "authorities," and as the manner of exercising it is a proper subject of legislative power, it is therefore competent for the legislature to prescribe the manner in which it should be exercised, in order that the governmental objects contemplated by the legislature should be accomplished, and not thwarted. The common council is either the appointing body, or it is simply an instrumentality to procure the meeting of its attending members, at which they are to make the appointments. The attending members really make the appointments, and whether such appointments, made in pursuance of the statute, are accurately styled the acts of the common council, is a grammarian's question, and not one of legal significance. Therefore, whether the common council as a body makes the appointment of police commissioners, or whether the attending members thereof make it, it is not necessary to decide, since in either case the body and the members thereof derive their authority from the statute, and, if the statute in question is not in harmony with previous statutes, it prevails over them in this matter, because it is the latest expression of the legislative will. The fact that the common council and its members are of statutory, not constitutional, creation, and that the statute which defines their usual powers and methods of procedure may be modified by statute, distinguishes the power here exercised by the legislature from that attempted to be exercised in respect to constitutional courts and officers in the cases cited by the counsel for the plaintiffs. Thus, in Menges v. City of Albany, 56 N. Y. 374, the legislature attempted to limit the power of a court of record to appoint commissioners to ascertain the compensation to be awarded to the owner of private property taken for public use, notwithstanding the fact that the constitution had clothed the court with full power to make the appointment. The attempt was a failure. Warner v. People, 2 Denio, 272, in one of its features, presented an attempt on the part of the legislature to provide for the appointment of the clerk of the court of common pleas otherwise than in the manner prescribed by the constitution; and in another feature of it the legislature attempted to exclude from that court, for the purposes of the appointment, some of its constitutional members. Both attempts failed. The same rule of decision governed in People v. Angle, 109 N. Y. 564, 17 N. E. 413, namely, the futility of a legislative attempt to contravene a constitutional provision. If the common council were the express creation of the constitution, it might be conceded that the legislature could not so regulate its procedure as to deprive the body, or any of its members, while in session, of the full and untrammeled exercise of their constitutional powers. But here neither common council nor any of its members have any power, in respect to this matter, except what this act gives them, and it gives it to them within expressed limitations. Their

power is limited, but their right to exercise such limited power as they have is full and untrammeled.

The other various objections to the attending members making the appointments do not seem to be grave: (1) Such members cannot be ascertained except by their attendance. The answer is, neither the constitution nor public policy forbids this method of ascertaining them. (2) Each attending member can vote for only two of the four commissioners. The answer is that no member could vote for even one without legislative authorization. The legislature, being the fountain of this voting power, can define its extent. (3) The legislature, and not the attending members, make the appointments. If this were true, it would be fatal. It is not true. The most that can be said is that the legislature designated the authorities who shall make the appointments, and so arranged the procedure that all the authorities designated shall have an equal voice in making them; in other words, that the majority party shall not efface the minority party. It may be that in our government by the people, for the people, the people have unwittingly, by their constitution, committed themselves to the doctrine that "to the victors belong the spoils." I do not think so. I think, rather, that in the matter of police appointments—and I need here look no further—the people have reserved to their legislature the power to provide that the government by the people may represent the largest practicable number of the people, namely, the majority, and the largest minority.

These views necessarily lead to a result at variance with that expressed in the instructive and able opinion of my Brother HERRICK. I find it easy to concur with him in the propositions that (1) the principle that the majority shall govern lies at the basis of our government; (2) that the principle of local self-government is fundamental in American political institutions. But I do not agree that our constitutions exclude all exceptions to the application of these propositions. Nor do I agree that the people receive no authority from the constitution. Without a constitution, written or unwritten, anarchy would prevail. Whatever civil rights we have are secured to us under our constitutions, and without them they would not be realizable. It is true that the people have not delegated to their governments all governmental power, and what is not delegated is reserved; but what is reserved cannot, while reserved, be used, since no organized power exists to use it. All that the people can do with it is to so amend or reconstruct their constitutions as to authorize its use. Otherwise we would have two constitutions,—one written and the other unwritten. Our constitutions are framed with great regard to the principle of the right of the majority to govern, and to the principle of local self-government; but our people have not been so unwise as to preclude in all cases—especially minor and local ones—resort to a modification of the methods founded upon these principles. I have attempted to show above such modification as justifies the legislation here under review. As to minority representation, or minority equality with the majority, so far as either is to affect the election of officers by the direct vote of the

people, the constitutional provision that every qualified voter shall, in his proper election district, "be entitled to vote  *  *  *  for all officers that now are or hereafter may be elective by the people," presents, I think, an insuperable objection.    As to the appointments authorized by article 10, § 2, of the constitution, I do not think any such objection exists.    That an appointee vested with governmental power or authority cannot be appointed by an appointee is, I confess, new to me.    I am not convinced that my Brother HERRICK has made it clear.    Therefore, without considering whether the plaintiffs have such a standing in court as enables them to present both of the constitutional questions above discussed, I advise that the judgment be reversed, and that judgment be directed for the defendants, with costs here and in the court below.

Judgment affirmed, with costs and disbursements.